**M. Philip LORBER,**
**Plaintiff,**

v.

**William A. BEEBE et al.,**
**Defendants.**

**No. 74 Civ. 384.**

United States District Court,
S. D. New York.

Oct. 30, 1975.

On Reargument Feb. 9, 1976.

---

Milberg & Weiss, New York City, for plaintiff by Melvyn I. Weiss, Jared Specthrie, New York City, of counsel.

Debevoise, Plimpton, Lyons & Gates, New York City, for Dunkin Donuts Inc. and the individual defendants by J. Asa Rountree, Lionel G. Hest, New York City, of counsel.

Cravath, Swaine & Moore, New York City, for defendant Price Waterhouse & Co. by John R. Hupper, Robert K. Baker, Alexander R. Sussman, New York City, of counsel.

White & Case, New York City, for the defendant Underwriters by Rayner M. Hamilton, Richard J. Holwell, New York City, of counsel.

WHITMAN KNAPP, District Judge.

This securities fraud action is presently before us on plaintiff's Rule 23 motion for class determination and defendants' cross-motion for summary judgment. For the reasons set forth below, plaintiff's Rule 23 motion is granted, but all of defendants' motions are denied, except for their motion to dismiss Count I of the complaint, which is granted.

On August 7, 1972, plaintiff—a concededly experienced investor and an attorney in his own right—purchased 1000 shares of defendant Dunkin Donuts, Inc. ("Dunkin") common stock through his broker, defendant Lehman Brothers Incorporated ("Lehman"). These shares were allegedly purchased as part of a public offering of Dunkin common stock shares issued pursuant to a Registration Statement and Prospectus effective July 27, 1972. It is this registration statement and prospectus—specifically, the financial statements and accompanying auditor's opinion—which are the subject of this lawsuit. A total of 350,000 common stock shares ("new" stock) were issued pursuant to this registration statement, while 600,000 previously issued shares ("old" stock) were already on the market. For the purposes of that part of the defendants' motion which is addressed to Count I, this distinction between "old" and "new" stock is crucial.

The alleged defect in the registration statement concerns the manner in which the accompanying audited financial statement treated the interest payments due on Dunkin's indebtedness. Dunkin

conducts a fast foods business, and owns or franchises an extensive chain of "Dunkin Donut" shops and "Howdy Beefburger" drive-in restaurants. It financed itself almost exclusively by issuing notes payable over a period of years (usually seven). It was a peculiarity of these notes that they were payable in unchanging annual installments, no designation being made as between the payment of interest and the return of principal. Thus, by way of arbitrary example, if Dunkin had taken out a seven year loan in 1960, the total cost of repaying principal and interest on which would have come to $70,000, Dunkin would have discharged that indebtedness in seven annual payments of $10,000 each. In such a situation, the first year's payment would necessarily have been in considerable part attributable to interest charges, the interest component would lessen in each succeeding year, and the last year's payment would consist almost wholly of the return of principal. The accounting method used in Dunkin's finanial statement did not, however, reflect this variation in interest charges. On the contrary, such statement reported interest on a so-called "straight line" method, whereby the same amount of interest would have been attributed to the first payment as to the last. Based on these facts, plaintiff makes a two-step contention: *first,* the accounting method used was improper, in that, because it failed to charge off enough interest in the early years of a loan, it artificially inflated Dunkin's report of net earnings and assets; and *second,* the huge amount of Dunkin loans outstanding caused this artificiality materially to inflate the market value of Dunkin stock.[1] Dunkin's auditor, defendant Price Waterhouse, presumably agreed as to the impropriety of the method, because it later compelled Dunkin to correct it by using an "effective interest" method of reporting, whereby the interest on the amount of principal actually outstanding would each year be reported. For purposes of these motions only, all defendants concede both impropriety and materiality.

With respect to the class action motion, plaintiff purports to sue both individually and on behalf of a proposed class consisting of all persons other than defendants who sustained damages by purchasing Dunkin common stock between July 27, 1972, the effective date of the subject Registration Statement, and February 15, 1973, the day on which the 1972 Annual Report informed the shareholders of the corrected accounting methods.[2] In addition to being the plaintiff in this action, Mr. Lorber, in his private capacity as an attorney, has rendered legal services to the class and expects to continue to do so if called upon by the firm of Milberg & Weiss, who appear as his attorneys in this action.

The defendants are: Dunkin, a Delaware corporation; five individuals who were Dunkin directors and/or officers during the relevant period; Price-Waterhouse & Co., Dunkin's auditors during that time; Goldman Sachs & Co., the managing underwriter of the 1972 offering; and 36 co-underwriters, including plaintiff's broker, Lehman Brothers. Plaintiff alleges that all defendants, directly or indirectly, "participated in or aided and abetted each other, or conspired with" each other to commit the acts or create the omissions complained of (Complaint, ¶ 24).

1. Dunkin used the same type of notes and the same accounting method in its own loans to its franchisees. Had its lendings to franchisees been of the same magnitude as its borrowings from others, any accounting errors would have cancelled out. However, plaintiff asserts that Dunkin's borrowings were far larger than its lendings so that the net effect of the error was to leave Dunkin with a materially inflated report of earnings and assets. It is also apparent that had Dunkin's indebtedness been constant in amount, the reporting method would not have distorted earnings. It must be plaintiff's theory that the indebtedness was increasing during the relevant period.

2. The news of the changeover had actually first gone out on January 19, 1973 over the Dow Jones "broad tape".

The Complaint alleges five causes of action. Count I asserts a claim under Section 11 of the 1933 Securities Act, 15 U.S.C. § 77k; Count II is based on Section 12(2) of the same Act, 15 U.S.C. § 77*l*; Count III invokes Section 10(b) of the 1934 Securities Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5, 17 C.F.R. 240.10b-5; and Counts IV and V allege common law fraud and negligence claims. So far as relevant to this action, the various statutes mentioned provide as follows:

■ Section 11 of the 1933 Act, upon which Count I is based, imposes what amounts to liability without fault for any registration statement found to be false or misleading. However, to avail himself of this section, a plaintiff must be able to demonstrate that the stock he purchased was issued pursuant to the particular registration statement found to have been false or misleading. Defendants have moved to dismiss plaintiff's claim under this section on the ground either that the stock he purchased was "old" and not "new", and thus had not been issued pursuant to the registration statement now claimed to have been false and misleading, but had been issued in the course of a previous offering, or that plaintiff cannot establish one way or another whether his stock was "old" or "new".

■ Section 12(2), upon which Count II is predicated, differs from Section 11 in several respects: (1) it does not impose liability without fault, but allows a due diligence defense; (2) as a general rule, it limits recovery to a purchaser's immediate seller; on the other hand, (3) it does not require proof that the stock in question was issued pursuant to any particular prospectus but supports liability if the immediate seller used any false or misleading prospectus (or indeed any oral misrepresentation) in effectuating the sale. Defendants seek dismissal of this Count on the alternative grounds that: (1) plaintiff purchased his stock in an open market transaction and thus can establish no immediate seller, or (2) if the underwriter (defendant Blyth

Eastman Dillon & Co., Inc.) from whom plaintiff's broker acquired the stock were deemed to be plaintiff's immediate seller, such underwriter did not supply plaintiff with any prospectus or otherwise communicate any information to him in effectuating the sale.

■ Liability under Section 10(b), upon which Count III rests, does not depend on whether a defendant was the immediate seller or whether the stock purchased by the plaintiff had been issued pursuant to any particular registration statement. The section does, however, as a general rule require proof that, among other things, the plaintiff relied on the particular misrepresentation alleged. Defendants' motion for summary judgment as to this Count is based on the contention that the record already before the court conclusively establishes that there was no such reliance.

As to the pendent claims asserted in Counts IV and V, defendants' position is that should plaintiff's federal claims be dismissed, the pendent claims must also fall.

I.

## DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

*Count I: Section 11 Claim*

■ Section 11 provides, in relevant part:

" * * * In case any part of the Registration Statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring *such securitiy* * * * may, * * * sue [the various categories of defendants now before the court] * * *" (emphasis supplied)

It is at once apparent that the foregoing language is ambiguous because of the lack of any antecedent to the words "such security". The courts in this Circuit have consistently resolved that ambiguity by limiting § 11 recovery to pur-

chasers of shares issued pursuant to the particular registration statement claimed (or found) to be defective. *Barnes v. Osofsky* (2d Cir. 1967) 373 F.2d 269, *Colonial Reality Corp. v. Brunswick Corp.* (S.D.N.Y.1966) 257 F.Supp. 875. Anyone who may . have purchased identical securities already traded on the open market must look elsewhere for relief. *Wolfson v. Solomon* (S.D.N.Y.1972) 54 F.R.D. 584, 588. It follows that a plaintiff, in order to have a valid § 11 cause of action, must plead and prove that his stock was issued pursuant to the particular registration statement alleged to be defective. *Barnes v. Osofsky, supra*, at 273. In the instant case, plaintiff must demonstrate that his 1,000 shares were "new" stock, as above defined; if he fails to do this, his § 11 claim must be dismissed.

A careful review of the pleadings and the papers submitted on the instant motions leads us to the inescapable conclusion that plaintiff cannot meet this test. He has neither pleaded nor could he prove that the stock he purchased was issued pursuant to the allegedly defective registration statement. In the first place, plaintiff makes no such allegation in that portion of the Complaint in which he sets forth Count I (¶s 25–28). Similarly in ¶ 4, under the heading "Parties", plaintiff describes himself as having purchased shares of Dunkin common stock "pursuant to *a* Registration Statement and Prospectus" (emphasis supplied). No attempt is made to specify the statement and prospectus pursuant to which his shares had been issued.[3] Without an allegation that it was the 1972 statement and prospectus, we have no reason for not assuming that it may not have been a previous statement and prospectus, and thus concluding that plaintiff may have purchased "old'" stock rather than "new".

The reason for plaintiff's caution in pleading becomes clear when one exam-ines the factual situation with which he was confronted. The defendants' papers (especially pp. 8–10, defendants' Joint Memorandum) go into great detail in establishing that plaintiff could not have purchased "new" but must have purchased "old" stock. As plaintiff does not claim to be able to dispute defendants' factual contentions, it would unduly burden this opinion to elaborate them. Suffice it to say that: (1) plaintiff's purchase of the stock was completed in 1972 when defendant Blyth Eastman Dillon & Co., Inc. (the seller from whom plaintiff's broker, defendant Lehman, had purchased the stock) delivered to a clearing house for defendant Lehman's account a certificate directly traceable to one which had been issued *before* the effective date of the 1972 registration statement (*i. e.*, "old" stock) ; and (2) plaintiff did not take physical possession of his stock until about a year later, at which time he received a certificate which came out of a Lehman "house account" which held both "old" and "new" shares on a fungible basis and thus could not be identified as either "old" or "new".

Plaintiff urges, however, that the critical question is not the origin of the certificate delivered to the clearing house for his broker's account in 1972, but the origin of the one actually delivered to him a year later. Moreover, conceding his inability conclusively to identify the latter certificate as "new", he contends that the burden of identification should be on defendants and that he should qualify for § 11 relief by showing that the certificate *might* have been traceable to "new" stock. Neither contention can prevail.

As to the first, is seems clear that the transaction was completed in 1972 when delivery of "old" stock was made by defendant Blyth to the clearing house U.C. C. § 8–301(1); § 8–320. When that

---

3. This was obviously not an oversight. In ¶ 4 of the Complaint, plaintiff alleges that he purchased his shares "pursuant to a Registration Statement". By way of contrast, in ¶ 7(c), he alleges that certain of the defendants signed "*the* Registration Statement . . . which became effective on July 27, 1972". (emphasis added)

transaction cleared, plaintiff acquired the rights—including the remedies [U.C.C. § 1–201(36), § 8–102(6)]—in the shares which Blyth conveyed. U.C.C. § 8–301(1).

With respect to plaintiff's second contention, under the law in this Circuit it is insufficient that stock "might" have been issued pursuant to a defective statement. A plaintiff must show that it actually was so issued. *Barnes v. Osofsky, supra,* 373 F.2d at 273, n. 2.

The plaintiffs in *Barnes*—who had purchased stock on the open market, and thus could not trace its origin—attempted to invoke § 11 to sustain recovery on the basis of misleading financial information contained in a certain registration statement. Those plaintiffs—much as does the one at bar—strongly argued that in such a case the burden of tracing should be shifted to the defendants. Since misleading financial information would affect the price of already outstanding stock to the same extent as newly issued stock, they argued, it would be unreasonable to distinguish between the two. To read Section 11 as affording a cause of action only to those purchasers who could trace lineage of their shares to a particular offering, they contended, would make the result turn on "mere accident", since most trading is done through brokers who neither know nor care about the origin of the stock they are handling. Finally, they noted, it is often impossible to determine the lineage of particular shares in situations where stock is held in fungible accounts in street name. The court speaking through Chief Judge Friendly, rejected those arguments and concluded that they were "unpersuasive" (373 F. 2d at 273), "inconsistent with the overall statutory scheme * * * [and] contrary to the legislative history". *(Id.,* at 272).

Count I is, accordingly, dismissed.

*Count II: Section 12(2) Claim*

 The second count purports to state a claim under Section 12(2) of the 1933 Act, 15 U.S.C. § 77l(2), which provides:

"Any person who—

\* \* \*

(2) *offers or sells a security* \* \* \* *by means of a prospectus* or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading \* \* *shall be liable to the person purchasing such security from him* \* \* \*. (emphasis supplied).

This section—unlike Section 11—focuses on the sale rather than the issuance of the security. As a general rule, therefore, the courts have limited the section to a plaintiff's immediate seller. *DeMarco v. Edens* (2d Cir. 1968) 390 F.2d 836, 841, n. 3; *Federman v. Empire Fire and Marine Insurance Co.* (S.D.N.Y. 1974) 1974–75 CCH Fed.Sec.L.Rep. ¶ 95,822 at 96.749; *Kramer v. Scientific Control Corp.* (E.D.Pa.1973) 365 F. Supp. 780, 791; *DuPont v. Wyly* (D. Del.1973) 61 F.R.D. 615, 625–627; *Unicorn Field, Inc. v. Cannon Group, Inc.* (S.D.N.Y.1973) 60 F.R.D. 217, 221–23; *Dorfman v. First Boston Corp.* (E.D.Pa. 1972) 336 F.Supp. 1089, 1091–93; *Fershtman v. Schectman* (S.D.N.Y.1970) 1970–71 CCH Fed.Sec.L.Rep. ¶ 92,996, *aff'd,* 450 F.2d 1357 (2d Cir. 1971), *cert. den.,* 405 U.S. 1066, 92 S.Ct. 1500, 31 L.Ed.2d 796 (1972) and *Wonneman v. Stratford Securities Co.* (S.D.N.Y.1961) 1957–61 Transfer Binder CCH Fed.Sec.L.Rep. ¶ 91,034. However, over the years, exceptions to this strict privity requirement have developed and, in certain carefully defined instances, liability has been extended to more than the plaintiff's immediate seller. Thus liability has attached to persons acting as the immediate seller's agent,[4] to defendants who are alleged to be controlling persons of the immediate seller,[5] and to those who have

---

4. *Value Line Fund Inc. v. Marcus* (S.D.N.Y. 1965) CCH Fed.Sec.L.Rep. ¶ 91,526.

5. *Johns Hopkins University v. Hutton* (4th Cir. 1970) 422 F.2d 1124, 1130; *Dorfman*

actively participated in the sale, either as an aider and abettor or as a co-conspirator.[6] See generally, *Federman v. Empire Fire and Marine Insurance Co.* (S.D.N.Y.1974) (1974–75 CCH Fed.Sec. L.Rep. ¶ 94,822 at 96.750–52; *Hill York Corp. v. American International Franchises, Inc.* (5th Cir. 1971) 448 F.2d 680, 693; III Loss, *Securities Regulations,* at 1712–21.

Viewing the instant complaint most favorably to plaintiff—as we must on a motion of this sort—his Section 12(2) claim must be deemed to qualify under the third exception. In paragraph 24, the Complaint alleges that all the named defendants "participated in or aided and abetted each other, or conspired with some or all of the other defendants to commit the acts or create the omissions" complained of.

Plaintiff may well find it impossible to prove these broad allegations. He does not specify which of the defendants "conspired" and which "aided and abetted". In either event, before a particular defendant could be found liable, plaintiff would have to establish that such defendant knew or should have known of the defect in the registration statement and either entered into a general scheme ("conspired") to defraud the public or deliberately assisted some other defendant ("aided and abetted") in using the misinformation in the course of a sale. Although we may entertain doubt as to plaintiff's ability to meet this burden, we cannot as a matter of law say that it is impossible. See *In re Caesars Palace Securities Litigation* (S.D.N.Y. 1973) 360 F.Supp. 366, 382.

Defendants' motion with respect to Count II is, accordingly, denied.

*Count III: Rule 10b–5 Claim*

 In order to prove a claim under § 10(b) and Rule 10b–5, a plain-tiff must as a general rule demonstrate not only that there was a material misrepresentation or omission, but also that he relied specifically on such defect in making his decision to purchase or sell. Put a different way, a plaintiff must show that the alleged misrepresentation (or omission) was the cause in fact of his decision. See, *e. g., List v. Fashion Park, Inc.* (2d Cir. 1965) 340 F.2d 457, 462, *cert. den.,* 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965).

With respect to the reliance requirement, the court in *List* noted (at 462):

"The test of 'reliance' is whether 'the misrepresentation is a substantial factor in determining the course of conduct which results in [the recipient's] loss.' The reason for this requirement * * * is to certify * * * that the conduct of the defendant actually caused the plaintiff's injury."

Several exceptions have, however, been made to that general rule. Starting with *Mills v. Electric Auto-Lite Co.* (1970) 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 and *Affiliated Ute Citizens v. United States* (1972) 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741, the courts have determined that in cases "involving primarily a failure to disclose," proof of reliance is not required for recovery. All that is required of a plaintiff in such a case is that he demonstrate that the facts withheld were material in the sense that a reasonable investor might have considered them important in the making of his investment decision. *Id.,* at 153–4, 92 S.Ct. 1456; *Mills, supra,* 396 U.S. at 385, 90 S.Ct. 616; *Herbst v. International Telephone and Telegraph Corp.* (2d Cir. 1974) 495 F.2d 1308; *Shapiro v. Merrill Lynch, Pierce, Fenner and Smith, Inc.* (2d Cir. 1974) 495 F.2d 228, 240; *Chris-Craft Industries, Irc. v. Piper Aircraft Corp.* (2d Cir. 1973) 480 F.2d 341, 373–4, *cert. den.*

---

*v. First Boston Corp.* (E.D.Pa.1972) 336 F. Supp. 1089; *Winter v. D.J. & M. Investment and Construction Corp.* (S.D.Cal.1970) 185 F.Supp. 943, 946–7; *Buchholtz v. Renard* (S.D.N.Y.1960) 188 F.Supp. 888; III Loss, *Securities Regulations,* 1719–20.

6. *Katz v. Amos Treat & Co.* (2d Cir. 1969) 411 F.2d 1046; *In re Caesars Palace Securities Litigation* (S.D.N.Y.1973) 360 F.Supp. 366, 379–82 (and cases cited therein).

414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d 148. In such cases, however, it is still open to a defendant to show that a given plaintiff would not have acted differently had he been aware of the undisclosed facts. *Rochez Bros., Inc. v. Rhoades* (3d Cir. 1974) 491 F.2d 402, 410.

Similarly and on essentially the same reasoning, proof of the reliance ingredient has been deemphasized in cases where the gravamen of the complaint is that the defendants were engaged in a "scheme to defraud" or a "course of business which operates as a fraud". *Competitive Associates, Inc. v. Laventhol, Krekstein, Horwath & Horwath* (2d Cir. 1975) 516 F.2d 811; *Schlick v. Penn-Dixie Cement Corp.* (2d Cir. 1974) 507 F.2d 374; *Crane Co. v. Westinghouse Air Brake Co.* (2d Cir. 1969) 419 F.2d 787, 797, cert. den., 400 U.S. 822, 91 S. Ct. 41, 27 L.Ed.2d 50 (1970).

 Plaintiff's position with respect to his 10b–5 claim is essentially two-fold: as a matter of fact he contends that this is a non-disclosure case (a factual conclusion which concededly would relieve him of the necessity of establishing reliance); and, as a matter of law, he contends that there is no viable distinction between affirmative misrepresentation and non-disclosure, and that the *Mills* and *Ute* doctrine should apply to both categories of cases. Neither such contention can be sustained.

With respect to the factual contention, we are persuaded by Judge MacMahon's reasoning in *Herzfeld v. Laventhol, Krekstein, Horwath & Horwath* (S.D. N.Y.1974) 378 F.Supp. 112. That case, like the one at bar, involved an accountant's misrepresentation of a company's financial condition. In rejecting a contention that the *Mills—Ute* non-disclosure doctrine should apply, Judge Mac-Mahon observed (at 127):

"It is of no moment that the misrepresentation in part resulted from failure to disclose material facts. We think the case no different from an accountant's false report of a company's earnings, a clear case of misrepresentation, because, in either case, the accountant makes representations which he knows are untrue. *Affiliated Ute Citizens of Utah v. United States,* therefore, which was grounded on a mere nondisclosure unaccompanied by any representation whatever, is inapposite."

With respect to the argument that there is no valid distinction between misrepresentation and non-disclosure, suffice it to say that—as recognized by Judge MacMahon in the case just cited—such distinction still prevails in this Circuit. As recently as April of this year, the Court of Appeals reiterated that "causation remains a necessary element in a private action for damages under Rule 10b–5", and cited *Ute* as a doctrine applicable only to "claims predicated on the non-disclosure of material facts".

*Titan Group, Inc. v. Faggen* (2d Cir. 1975) 513 F.2d 234, 238–9.[7] Under the rule established in this Circuit, then, plaintiff must show that the alleged misrepresentations in Dunkin's financial statements were a "substantial factor" in his decision to buy Dunkin stock. *Herzfeld v. Laventhol, Krekstein, Horwath & Horwath, supra,* at 127–8, citing *List v. Fashion Park, Inc.* (2d Cir. 1965) 340 F.2d 457, 462; *Globus v. Law Research Services, Inc.* (2d Cir. 1969) 418 F.2d 1276, cert. den., 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93; *Werfel v. Kramarsky* (S.D.N.Y.1974) 61 F.R.D. 674, 681; *Siegel v. Realty Equities Corp. of N.Y.* (S.D.N.Y.1972) 54 F.R.D. 420, 424–5. For the reasons set forth below, we have concluded that the ques-

7. Plaintiff calls attention to the circumstances that neither *Titan Group* nor *Herzfeld* involved class actions, and—citing dictum in a recent Ninth Circuit case (*Blackie v. Barrack,* 524 F.2d 891, filed September 25, 1975) —urges that a different rule should apply to a class action. This seems to us an untenable position. A class of valid claims cannot be created by aggregating a host of invalid ones.

tion of whether such a showing can be made must be answered in the affirmative, leaving to trial a determination of whether it was in fact such a "substantial factor".

 Defendants contend that plaintiff's deposition testimony establishes that the alleged misstatement of earnings and net assets had absolutely no effect on his decision to buy the stock. Thus, in making his decision to purchase, plaintiff considered Dunkin's earning trend (Plaintiff's Deposition, pp. 10, 15–17, 20–21, 23, 37), the historical range in the price of Dunkin stock (pp. 10, 17, 21–22, 37), Dunkin's "retained earnings" figures (pp. 10, 21, 37) and his broker's explanation of the decline in Dunkin's fiscal 1971 earnings (pp. 10, 16, 17, 20–21, 23, 37). It is defendants' position that the only one of those factors—Dunkin's earning trend—which was even arguably affected by the alleged misstatement was affected in so imperceptible a manner that it could not, as a matter of law, be deemed to have caused plaintiff to buy Dunkin stock. They claim that Dunkin's earning trend —which plaintiff regarded as the single most important factor in his investment decision—would have remained unchanged over the entire 1967–1971 period if earnings figures had been arrived at by means of the application of the "effective interest" method of allocation. The sole noticeable effect of using the effective interest method would, they argue, have been to shift the entire earning trend line slightly downward, without changing the slope of the line at all. In support of their argument, they have prepared a graph (reproduced in the margin [8]) which purports to demonstrate this.

8.

Even assuming the accuracy of this graph—which plaintiff is at pains to point out he is not presently in a position to challenge, given the fact that the lawsuit is still in its nascent stages—we must conclude that the question of causation remains one to be resolved at trial. In his complaint—as opposed to his deposition testimony—plaintiff places great emphasis on his own computations to the effect that use of the effective interest method would have reduced earnings by 4% and 9% for 1970 and 1971, respectively, thereby implying that had he known that, he would not have bought. Moreover, plaintiff alleges (in ¶ 35) that he relied on the "inflated market prices of Dunkin common stock . . . and the truth and accuracy" of the allegedly misleading financial statements. Although we doubt that this general allegation as to reliance is sufficient to satisfy the causation in fact requirement (cf., Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc., supra, at 240), neither can we rule as a matter of law that plaintiff—on the basis of his deposition testimony alone—will be unable to demonstrate that had he seen the revised earnings figures prior to his purchase, he would not have bought Dunkin stock. Although the transcript of his deposition testimony contains many answers which suggest that the requisite reliance may be most difficult to prove at trial, it, by the same token, nowhere specifically contradicts the allegations in the complaint with respect to reliance which, if proven, would satisfy the causation requirement.

The motion with respect to Count III is, accordingly, denied.

*Counts IV and V: Common Law Fraud and Negligence Claims*

Defendants seek summary judgment dismissing these pendent state law claims on two grounds, both of which are insufficient in light of our holdings above. In the first place, defendants argue that since causation is also a necessary element of claims based on common law fraud and negligence theories,[9] plaintiff's alleged failure as a matter of law to show causation on his Rule 10b–5 claim dictates dismissal of these claims as well. Having determined that such a conclusion cannot at this point be made as a matter of law, defendants' argument must similarly be rejected here. The second ground advanced by defendants—that dismissal of plaintiff's federal claims in Counts I, II and III eliminates the foundation for pendent jurisdiction[10]—is equally unavailing, since we have already determined to retain two of plaintiff's federal claims (Counts II and III).

Motion denied as to Counts IV and V.

*Class Action*

Having granted defendants' motion for summary judgment dismissing Count 1 (the Section 11 claim), we need only determine the appropriateness of class action status as to the remaining § 12(2), § 10b and the common law fraud and negligence claims.[11]

9. See *Allied Financial Corp v. Duo Factors, Inc.* (1st Dept. 1966) 26 A.D.2d 538, 271 N.Y.S.2d 402 aff'd, 19 N.Y.2d 865, 280 N.Y.S.2d 668, 227 N.E.2d 591 (1967); *Sy-Jo Luncheonette v. Marsay Distributors* (1st Dept. 1951) 279 App.Div. 715, 108 N.Y.S. 2d 349, aff'd, 304 N.Y. 747, 108 N.E.2d 614 (1952); Prosser, *Law of Torts* 686, 714–5 (4th ed. 1971); *Restatement (Second) of Torts* § 548A, comment a; § 522(2) (Tentative Draft No. 11, April 15, 1965); 3 *Restatement of Torts* §§ 525, 546 (1938).

10. See *United Mine Workers of America v. Gibbs* (1966) 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218; *Alfred Dunhill Ltd. v. Interstate Cigar Co.* (2d Cir. 1974) 499 F.2d 232, 238; *Rogers v. Valentine* (2d Cir. 1970) 426 F.2d 1361, 1363; *Zeller v. Bogue Electric Manufacturing Corp.* (S.D.N.Y. 1972) 346 F.Supp. 651, 654, *rev'd on other grounds*, 476 F.2d 795 (2d Cir.), *cert. denied*, 414 U.S. 908, 94 S.Ct. 217, 38 L.Ed.2d 146 (1973).

11. Plaintiff has objected all along to the propriety of the resolution of defendants' motion for summary judgment simultaneously with its determination of his class action motion. Essentially, his argument is that the decision in *Eisen v. Carisle and Jacqueline* (1974) 417 U.S. 156, 177, 94 S.Ct. 2140, 40 L.Ed.2d 732, precludes *any* determination on the merits prior to a determination of the

As noted earlier, the class proposed by plaintiff would consist of all persons or entities who suffered damage through the purchase of Dunkin stock between July 27, 1972—the effective date of the allegedly defective Registration Statement—and February 15, 1973 the day on which the 1972 Annual Report informed the shareholders of the change in accounting methods.

Rule 23(a) of the Federal Rules of Civil Procedure spells out four prerequisites to the maintenance of a class action:

(1) the class must be so numerous that joinder of all members is impracticable;

(2) there must be questions of law or fact common to the class;

(3) the claims of the representative party must be typical of the claims of the class; and

(4) the representative party must be able to fairly and adequately protect the interests of the class.

Moreover, at least one of the three elements described in R. 23(b) [12] must also be present. Plaintiff has elected to focus on subsection 3.

Defendants advance four reasons which, they contend, warrant denial of plaintiff's motion for class determination:

"(a) the inherent conflict in plaintiff's dual role as both the representative of the class and as an attorney rendering legal services to the class makes it impossible for him to 'fairly and adequately protect the interests of the class' as required by Fed.R.Civ. P Rule 23(a)(4);

(b) the common questions arising from plaintiff's claims based on Section 12 (2) of the 1933 Act (Count II) do not 'predominate over' questions affecting only individual members as required by Rule 23(b)(3);

(c) plaintiff's 10b–5 claim (Count III) presents predominating individu-

---

class action issues. The specific language in *Eisen* relied upon by plaintiff belies any such conclusion:

"We find nothing in either the language or history of Rule 23 that gives a court any authority to conduct a preliminary inquiry into the merits of a suit *in order to determine whether it may be maintained as a class action*". 417 U.S. at 177, 94 S.Ct. at 2152 (emphasis supplied).

The instant case does not involve any such inquiry. The motion for summary judgment is entirely separate and distinct from that for a class action. It is not in any way addressed to the appropriateness of a class action. Rather it is addressed to the substance of the plaintiff's own claim. There is nothing in Rule 23 which precludes the court from examining the merits of plaintiff's claims on a proper Rule 12 motion to dismiss or Rule 56 motion for summary judgment simply because such a motion is made returnable on the same day as a R. 23 class action motion. *Miller v. Mackey International, Inc.* (5th Cir. 1971) 452 F.2d 424, 428–9. Having already dismissed plaintiff's Section 11 claim, we need only determine the appropriateness of a class action with respect to the remaining claims. *Wolfson v. Solomon* (S.D.N.Y.1972) 54 F.R.D. 584, 588.

12. (b) Class Actions Maintainable. An action may be maintained as a class action if

the prerequisites of subdivision (a) are satisfied, and in addition:

(1) the prosecution of separate actions by or against individual members of the class would create a risk of

(A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

al questions and his proposed 10b–5 class is overly broad; and

(d) plaintiff has made no attempt to show, as required by Rule 23, that class action treatment is appropriate for his common law fraud and negligence claims (Counts IV and V)."

A. *Plaintiff's Ability to Adequately Protect the Interests of the Proposed Class*

Defendants extensively—and persuasively—argue that, since plaintiff is a lawyer who looks to this action as a source of legal fees which might be substantial even in the face of an unfavorable settlement, he cannot properly represent a class in whose interest it might be to insist upon pursuing the matter to final judgment. However, on oral argument—upon inquiry from the court—plaintiff's atttorney represented that plaintiff was willing to be bound by a direction which would preclude him from any participation in legal fees. Any order granting class action status will be predicated upon satisfactory personal assurance from plaintiff that he will be bound by and respect an order prohibiting him from any participation—direct or indirect—in any legal fees or disbursements awarded in, or arising from, this action. See *Umbriac v. American Snacks, Inc.* (E.D.Pa.1975) 388 F.Supp. 265 at p. 271; *Kramer v. Scientific Control Corp.* (E.D.Pa.1973) 365 F.Supp 780.

B. *The Predominance of Common Questions—Plaintiff's Section 12 (2) Claim*

It is defendants' position that a finding of predominance with respect to plaintiff's Section 12(2) claim is precluded by the alleged existence of the following four questions:

(1) whether any of the underwriter defendants herein, acting as principal, offered or sold Dunkin stock to each individual class member "by means of a prospectus or oral communication";

(2) whether the defendant underwriter who so offered or sold to each individual class member knew, or in the exercise of reasonable care should have known, of the alleged misstatement;

(3) whether each individual class member learned that the Registration Statement was defective prior to January 22, 1973 (more than one year before the filing of the instant complaint);

(4) the amount of damages suffered by each individual member.[13]

The first of these contentions is on its face persuasive. If it were necessary to establish that a misrepresentation had been made to each member of the proposed class by such member's immediate seller, a class action would indeed be unmanageable. However, as we have seen (see *supra,* at p. 288), plaintiff is not proceeding on the immediate seller theory, but basically on a claim of conspiracy and aiding and abetting. If such a claim should be established, recovery would be available generally to members of the proposed class. The fact that the claim may be difficult to establish is no impediment to certification of a class. *Miller v. Mackey International, Inc.* (5th Cir. 1971) 452 F.2d 424, cited with express approval in *Eisen v. Carlisle and Jacqueline* (1974) 417 U.S. 156, 178, 94 S.Ct. 2140, 40 L.Ed.2d 732.

Much the same considerations apply to defendants' second objection. While it may be difficult to prove that any particular defendant had knowledge of the alleged defect in the registration statement, success in such an endeavor would, given the claims of conspiracy and aiding and abetting, enure to the proposed class generally, and not to any

---

13. Defendants make a further claim that those members of the proposed class who purchased after news of the accounting change had gone out over the "broad tape" would have the burden of establishing that they were justifiably unaware of that news. However, this contention does not seem to us to go to the question of whether a class should be certified, but goes to the claim of overbreadth. It will therefore be discussed below under that rubric.

individual member thereof. See, *Frankel v. Willie and Thornhill, Inc.* (W.D.Va. 1972) 55 F.R.D. 330.

 In their third objection, defendants point out that the applicable statute of limitations (one year) would defeat any class member's claim if it could be shown that such member had—or in the exercise of reasonable care should have—acquired knowledge of the defect in the five day period elapsing between the day on which news of the new accounting method first went out over the "broad tape" [14] and January 22, 1973 (the instant complaint having been filed on January 22, 1974). In the first place, any defense based on the statute of limitations is an affirmative defense, and courts have traditionally been reluctant to deny class action status simply because affirmative defenses *may* be available against individual members. *Lamb v. United Security Life* (S.D.Iowa 1972), 59 F.R.D. 25, 34; *Zeigler v. Gibralter Life Insurance Company of America* (D.S.D.1967) 43 F.R.D. 169, 173. In the second place, it seems unlikely—unless a particular class member happens to be a broker or professional investor—that defendants will be able to bring home knowledge (actual or constructive) of the contents of the "broad tape".

The fourth objection—that damages will have to be separately established by individual class members—is a problem which besets many class litigations, and should not form a basis for denial of certification. *Green v. Wolf Corp.* (2d Cir. 1968) 406 F.2d 291, 301; *Siegel v. Realty Equities Corp. of N. Y.* (S.D.N.Y.1972) 54 F.R.D. 420, 427; *Berland v. Mack* (S.D.N.Y.1969) 48 F.R.D. 121, 128.

### C. *Rule 10b–5 Claim*

Defendants make their strongest point with respect to the 10b–5 claim in arguing that questions of reliance will necessarily be different as to each member of the class and will—as to each member—necessarily require extensive individual litigation (see *supra* pp. 290–291 for a discussion of the reliance problems presented by plaintiff's own claim). However, as we have seen, plaintiff's 10b–5 claim could be established by sustaining the allegation that defendants were engaged in a "scheme to defraud". Proof as to such a "scheme" would necessarily enure to the class as a whole. If that allegation should prove to be unsubstantial and should the 10b–5 claim break down into a series of essentially unrelated lawsuits, the court would entertain a motion to dissolve the class. F.R.C.P. 23(c)(1) and (3).

### D. *The Pendent Claims*

Defendants make the technical argument that plaintiff's papers do not separately set forth reasons for class certification with respect to the pendent claims, and that plaintiff has therefore failed to carry his burden in this regard. See *DeMarco v. Edens* (2d Cir. 1968) 390 F.2d 836, 845; Moore's *Federal Practice*, Vol. 3B, p. 23–156. While this argument may be technically correct, there seems no sound reason for distinguishing between the pendent and the federal claims, so certification will cover both categories.

### E. *Overbreadth*

Defendants make two objections to the parameters of the class. First they argue that special problems are presented by those potential class members who purchased in the five day period between the first public announcement of the change in accounting method and the distribution to the shareholders of the Annual Report in which that change was explained. Second, defendants contend that any potential class members who both purchased and sold before there had been any announcement could not possibly have suffered loss.

The first of these contentions presents considerations similar to those presented by the claim that individual statute of

14. See note 2, *supra*.

limitations questions are so predominant as to preclude the establishment of any class (see p. 294, *supra*), although, the burden of proof on the issue of knowledge might be on the plaintiffs in the case of purchasers within this five day period. For present purposes, it is sufficient to note that if at some future time these problems should present difficulties, a subclass could be created or those who purchased within this five day period could be eliminated. Rule 23(c)(1) & (4).

With respect to the second objection, we must confess an inability to see how a purchaser who bought during a period of claimed market price inflation and sold during the same period can have suffered damage. However, we see no reason why such purchasers should not have an opportunity to make their own arguments on the question. It is plaintiff who has the burden of giving them notice, and we do not see how the defendants can be prejudiced by their perhaps temporary inclusion in the class.

## CONCLUSION

1. The proposed class is so numerous (more than 1,000 purchasers) that joinder of all members is impracticable.

2. There are questions of law or fact common to the class which predominate over any questions affecting only individual members.

3. The claims of the representative party are typical of the claims of the class, and

4. Plaintiff will, on the conditions above stated, fairly and adequately protect the interests of the class.

5. A class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Motion granted as to Counts II–IV.

## ON REARGUMENT

On December 9, 1975, the defendants in the above-entitled case moved for re-

argument of the summary judgment and class action motions decided by the Court in a Memorandum and Order dated October 30, 1975. Said motion for reargument was granted and oral argument was heard on December 19, 1975, as a result of which my October 30 decision is amended in the following respects:[15]

4. Defendants' motion for summary judgment dismissing Count II [§ 12(2) claim]—previously denied—is now granted.

5. Our original decision denying defendants' motion as to Count III (R. 10b–5 claim) is adhered to.

6. Plaintiff's R. 23 motion for class determination—originally granted—is now denied.

7. A question is certified pursuant to § 1292(b) under specified conditions.

I. *Section 12(2) Claim*

In denying defendants' R. 56 motion for summary judgment dismissing this Count, we incorrectly—in light of the language and intent of Rule 56—based our decision on the unsworn, conclusory allegations of "conspiracy" and "aiding and abetting" in paragraph 24 of the complaint. (p. 288.) On oral argument of the instant motion for reargument, plaintiff's counsel—with commendable candor—in effect conceded that the reason he did not support the conclusory allegations with factual statements was that no such facts were available. The underpinnings of our denial of the motion for summary judgment dismissing Count II having thus been shorn away, such motion is granted, with respect to all defendants except Blyth and Lehman.

As to these defendants, plaintiff makes the additional claim that they were his actual sellers who effected the sales by "means of a prospectus or oral communication". However, defendants produced evidence—which plaintiff has not disputed—that plaintiff made his purchase of Dunkin stock on the open market,

15. The amendments set forth in paragraphs 1, 2 and 3 have been incorporated into the opinion by changes in the text, so those paragraphs are here deleted.

without making any inquiry as to who his seller would be. Although he placed his order with his broker, the defendant Lehman, Lehman acted solely as his agent in the transaction, not as his seller. As events turned out, the defendant Blyth was plaintiff's actual seller, but it did not sell the stock "by means of a prospectus or oral communication", as required by § 12(2). In the absence of any contrary evidence from plaintiff, this account of the parties' respective roles must be accepted as true. Therefore, neither the defendant Blyth (because it did not sell by means of a prospectus or oral communication) nor the defendant Lehman (because it was not plaintiff's seller) can be liable under § 12(2) and as to them defendants' motion for summary judgment must also be granted.

## II. *Rule 10b–5 Claim*

The plaintiff having for all purposes disclaimed any reliance on a conspiracy [16] theory of liability, is left, on his R. 10b–5 claim, with the burden of demonstrating that he subjectively relied on the alleged misrepresentations in Dunkin's financial statements and that said misrepresentations were a "substantial factor" in his decision to purchase Dunkin stock (at 288). Although we expressed grave doubt that plaintiff would be able to meet such a burden, we were reluctant to dismiss his 10b–5 claim since his deposition testimony "nowhere specifically contradicts the allegations in the complaint with [regard] to reliance" (*Id.,* at 291). In pressing us to reconsider our decision, defendants stress that plaintiff has come forward with no evidence that he did in fact rely or that the alleged misrepresentations had any effect whatsoever on his decision to purchase. In response, plaintiff points to a passage appearing on page 17 of his deposition testimony with respect to the price-earnings ratio of Dunkin stock, which he claims supports his position. Specifically, when asked by

defense counsel if he, in deciding whether to purchase a stock, took "into account the so-called price-earnings ratio", the plaintiff responded: "That would reflect itself in the earnings and price of the stock which are the two things I consider". Defendants conceded at oral argument that if plaintiff had simply responded "yes" in answer to that question, it would have been a sufficient statement of reliance to meet plaintiff's burden under R. 10b–5. After extended colloquy at the hearing on the instant motion, I concluded that plaintiff's response was sufficiently ambiguous to preclude a definitive finding, as a matter of law, that he did *not* consider the price/earnings ratio and, therefore, did not rely on the alleged misrepresentations which necessarily would have affected said ratio. There thus being a question of fact as to plaintiff's reliance, our original decision denying defendants' motion for summary judgment dismissing Count III is adhered to.

## III. *Class Action*

[24] For the same reasons, however, that we have declined to dismiss plaintiff's R. 10b–5 claim—namely, that there is a material issue of fact on the question of his reliance—we must deny his motion for class action determination. Our earlier certification of a class was based on the expectation that individual proof of reliance would be avoided if plaintiff could prove that defendants were engaged in a "scheme to defraud" (294). The plaintiff having abandoned any intention of offering such proof, we withdraw our earlier certification of a class and deny plaintiff's R. 23 motion as to the remaining Counts.[17]

## IV. *Certification Pursuant to 28 U.S.C. § 1292(b).*

This disposition leaves plaintiff's litigation in an unhappy posture. If our rulings are erroneous, he has been

---

16. By "conspiracy" we also mean to include "aiding and abetting", and "scheme to defraud".

17. Having already dismissed plaintiff's §§ 11 and 12(2) claims (Counts I and II, respectively), it goes without saying that he is not entitled to a class on those Counts.

improperly deprived of a viable class action. However, he cannot obtain review of those rulings without going through a time-consuming and—at best—not highly rewarding trial of his individual 10b–5 and common law claims. Moreover, as long as those claims are outstanding, we cannot certify that an appeal would "materially advance the ultimate termination of the litigation". It seems to us that this dilemma can be avoided if plaintiff should stipulate that if an appeal to the Court of Appeals were allowed and should result in affirmance, plaintiff would consent that judgment absolute be entered against him dismissing the entire complaint.[18] Accordingly if such a stipulation is submitted, we shall certify a question pursuant to § 1292(b).

### V. CONCLUSION

1. Counts I and II are dismissed while Counts III–V are allowed to remain standing.
2. Plaintiff's R. 23 motion for class action certification as to the remaining Counts is denied.
3. A question will be certified pursuant to § 1292(b) if plaintiff so requests and complies with the conditions specified.

18. An analogy to the suggested proceeding is found in New York C.P.L.R. § 5601(c).