In re HOME–STAKE PRODUCTION COMPANY SECURITIES LITIGATION.

Ivan A. ANIXTER et al., Plaintiffs,

v.

HOME–STAKE PRODUCTION COMPANY et al., Defendants.

Ivan A. ANIXTER et al., Plaintiffs,

v.

Harry HELLER et al., Defendants.

Peter Paul LUCE et al., Plaintiffs,

v.

ARTHUR ANDERSEN & CO., a partnership, Defendant.

William D. ROBERTSON et al., Plaintiffs,

v.

McKEE, ATKINS & SCHULER, a partnership, Defendant.

MDL No. 153 and Civ. A. Nos. 73–C–382, 73–C–377, 74–C–244, 75–C–431 and 75–C–432.

United States District Court, N. D. Oklahoma.

July 29, 1977.

Holliman, Langholz, Runnels & Dorwart, Fred Dorwart, David W. Holden, Tulsa, Okl., for Home-Stake and plaintiffs in 73–C–58 and 73–C–377 and defendants in 73–C–175, 73–C–227 and 73–C–382.

C. D. McDoulett, Jr., Tulsa, Okl., for Home-Stake and plaintiffs in 73–C–58 and 73–C–377.

Doerner, Stuart, Saunders, Daniel & Langenkamp, Dobie Langenkamp, Michael Lewis, Tulsa, Okl., for Streicher Broeker, et al., and for plaintiffs in 73–C–175, 74–C–181 and 73–C–227 and defendants in 73–C–58.

Jones, Givens, Brett, Gotcher, Doyle & Atkins, Phillips Breckinridge, Jack R. Givens, Tulsa, Okl., for United California Bank, et al., and plaintiffs in 73–C–175 and 73–C–227 and Halvorson, et al., and defendants in 73–C–58.

Sneed, Lang & Trotter, James C. Lang, Tulsa, Okl., for Trippet and plaintiffs in 73–C–304 and 73–C–377 and defendants in 73–C–58, 73–C–175, 73–C–227, 73–C–344, 73–C–377, 73–C–409, 74–C–151, 74–C–176, 74–C–178, 74–C–180, 74–C–181, 74–C–208, 74–C–224 through 74–C–226, 74–C–229 through 74–C–232 and 74–C–278.

Robert S. Trippet, pro se.

Hall, Estill, Hardwick, Gable, Collingswood & Nelso, Fred S. Nelson, Harry L. Seay, III, Tulsa, Okl., for Leachman, Wexler, Anderson, et al., and plaintiffs in 73–C–344, 73–C–409, 74–C–176, 74–C–178, 74–C–179, 74–C–208, 74–C–224 through 74–C–232 and 75–C–434.

Caplin & Drysdale, Peter Van N. Lockwood, John T. Shinkle, Philip T. Lacy, John F. Dienelt, Washington, D. C., for Leachman, Wexler, et al., and plaintiffs in 73–C–344, 73–C–409, 74–C–176, 74–C–178, 74–C–179 and 74–C–232.

McFarland, Kuchins & Jackson, Gary M. Caylor, San Francisco, Cal., for Home-Stake, et al., and plaintiffs in 73–C–377 and defendants in 73–C–382.

Broad, Khourie & Schulz, William A. Wineberg, Jr., San Francisco, Cal., for Anixter, et al., and plaintiffs in 73–C–382, 74–C–244 and 75–C–430 through 75–C–432 and defendants in 73–C–377.

Stephen Theoharis, Robert McCarthy, San Francisco, Cal., for Anixter and plaintiffs in 73–C–382, 74–C–244 and 75–C–430 through 75–C–432.

Stephen Rauch, Dillon & O'Brien, New York City, for Chase Manhattan Bank, et al., and plaintiffs in 74–C–151.

Gilbert, Segall & Young, Harold F. McGuire, Jr., Lowell A. Margolin, New York City, for Anderson, et al., and plaintiffs in 74–C–180, 74–C–224 through 74–C–231 and 75–C–434.

Lester A. Klaus, Oklahoma City, Okl., for Trippet and plaintiffs in 73–C–304 and defendants in 73–C–58, 73–C–175, 73–C–227, 73–C–344, 73–C–377, 73–C–409, 74–C–151, 74–C–176, 74–C–178 through 74–C–181, 74–C–208, 74–C–224 through 74–C–226, 74–C–228 through 74–C–230 and 74–C–232.

Gene Mortensen, A. F. Ringold, Rosenstein, Fist & Ringold, Tulsa, Okl., for Home-Stake and plaintiffs in 73–B–922 and defendants in 73–C–304, 73–C–377, 73–C–382 and 74–C–244.

Royce H. Savage, Tulsa, Okl., for Home-Stake and plaintiffs in 73–B–922.

Satterlee & Stephens, New York City, for Bradley, et al., and plaintiffs in 74–C–278.

Stephen R. Bell, Wilkinson, Cragun & Barker, Washington, D. C., for Glen A. Wilkinson and plaintiffs in 75–C–413.

Cayman Water Co. Ltd., Grand Cayman, Cayman Islands, British West Indies, for plaintiffs in 74–C–151.

Richard T. Sonberg and Gene Buzzard, Tulsa, Okl., for Parkhurst and plaintiffs in 74–C–151.

Sonberg & Waddel, Tulsa, Okl., for Parkhurst and plaintiffs in 74–C–151 and Sims and defendants in 73–C–377 and 73–C–382.

Patrick O. Waddel, Tulsa, Okl., for Sims and defendants in 73–C–377 and 73–C–382.

Eagleton, Eagleton & Owens, George W. Owens, Tulsa, Okl., for Kunkel, Fitzgerald and defendants in 73–C–175, 73–C–377, 73–C–382, 74–C–151, 74–C–181, 74–C–224 through 74–C–226, 74–C–229, 74–C–230 and 74–C–244.

Crowe, Dunlevy, Thweat, Swinford, Johnson & Burdick, Wm. G. Paul, Harry A. Woods, Jr., Oklahoma City, Okl., for Keplinger & Assoc., and defendants in 73–C–344, 73–C–409 and 74–C–232.

Thomas A. Landrith, Jr., pro se.

Farella, Braun & Martel, John L. Cooper, Howard M. Wexler, San Francisco, Cal., for Cross and defendants in 73–C–382.

B. Hayden Crawford, Tulsa, Okl., for Cross and defendants in 73–C–175, 73–C–377, 73–C–382, 74–C–179 through 74–C–181.

Pryor, Braun, Cashman & Sherman, New York City, for Home-Stake and plaintiffs in 74–C–151.

Rucker, Tabor, McBride & Hopkins, William D. Hunt, Truman Rucker, Donald G. Hopkins, Tulsa, Okl., for Heller & Firm of Simpson, et al., and defendants in 73–C–175, 73–C–377, 74–C–151, 74–C–180, 74–C–181, 74–C–208, 74–C–224 through 74–C–226, 74–C–228 through 74–C–231 and 74–C–244.

R. L. Davidson, Houston, Davidson, Jacoby, Main & Nelson, Tulsa, Okl., for Metcalfe and defendants in 73–C–175, 73–C–377, 73–C–382, 74–C–151, 74–C–181, 74–C–232, 74–C–278 and 74–C–383.

Charles C. Baker, Gable, Gotwals, Rubin, Fox, Johnson & Baker, James M. Sturdivant, Tulsa, Okl., for McAfee, Taft, et al., and defendants in 73–C–377, 73–C–382, 74–C–151, 74–C–176, 74–C–180, 74–C–230, 74–C–232, 74–C–244.

Lance Stockwell, Boesche, McDermott & Eskridge, Tulsa, Okl., Leon Silveman, Fried, Frank, Harris, Shriver & Jacobson, New York City, for Heller & Simpson and defendants in 73–C–175, 74–C–151, 74–C–180, 74–C–181, 74–C–208, 74–C–224 through 74–C–231 and 74–C–244.

Pray, Scott & Livingston, Roger Scott, Tulsa, Okl., for Klineman and defendants in 74–C–178.

Harry M. Crowe, Jr., Crowe & Thieman, Tulsa, Okl., for Gutelius and defendants in 73–C–175, 73–C–344, 73–C–377, 73–C–382, 74–C–151, 74–C–181, 74–C–232 and 74–C–278.

Charles W. Boand, Wilson & McIlvaine, Chicago, Ill., John L. Arrington, Jr., J. Clarke Kendall, II, Huffman, Arrington, Scheurich & Kihle, Tulsa, Okl., for A. Anderson & Co., and defendants in 74–C–227.

Joseph A. Sharp, Best, Sharp, Thomas, Glass & Warner, Tulsa, Okl., for Landrith and defendants in 73–C–175, 73–C–304, 73–C–344, 73–C–377, 73–C–382, 73–C–409, 74–C–151, 74–C–180, 74–C–181, 74–C–224 through 74–C–232.

Roy J. Davis, James W. Shepherd, Theodore M. Elam, Andrews, Mosburg, Davis, Elam, Legg & Bixler, Oklahoma City, Okl., for Blum and defendants in 73–C–175, 74–C–151, 74–C–180, 74–C–181, 74–C–208, 73–C–377, 73–C–382, 74–C–224 through 74–C–231 and 74–C–244.

David Jackson, Schuman, Milsten & Jackson, Tulsa, Okl., R. F. Wade, Gregg & Wade, Los Angeles, Cal., for Lewis & Ganong and defendants in 73–C–175, 73–C–377, 73–C–382, 74–C–151, 74–C–180, 74–C–181, 74–C–226 through 74–C–231.

Frank E. Turner, Tulsa, Okl., for Smith and defendants in 73–C–377 and 73–C–382.

Dyer, Powers, Marsh, Turner & Powers, Tulsa, Okl., for Smith and defendants in 73–C–377, 73–C–382 and 74–C–176.

Buchanan, Tollefsen & Brazelton, Los Angeles, Cal., for Ganong and defendants in 73–C–175, 73–C–377, 73–C–382, 74–C–151, 74–C–180, 74–C–181, 74–C–227 through 74–C–232.

Ronald A. Skoller, Tulsa, Okl., for Smith and defendants in 74–C–176.

Irvine E. Ungerman, Hawley C. Kerr, Ungerman, Grabel & Ungerman, Tulsa, Okl., for Dryfoos & Co. and defendants in 74–C–178.

John B. Jarboe, Jarboe, Keefer & Barrow, Tulsa, Okl., for Home-Stake and defendants in 74–C–151.

Stan P. Doyle, Doyle & Holmes, Tulsa, Okl., for Kothe and defendants in 74–C–377 and 74–C–382.

John S. Athens and Gary H. Baker, Tulsa, Okl., for Larrabee & Foulke and defendants in 73–C–377, 73–C–382, 74–C–151, 74–C–180, 74–C–230, 74–C–232, 74–C–244 and 74–C–278.

Conner, Winters, Ballaine, Barry & McGowen, Tulsa, Okl., for Larrabee, Foulke, First Nat. Bank, Tulsa and Home-Stake and defendants in 73–C–377, 73–C–382, 74–C–151, 74–C–180, 74–C–230, 74–C–232, 74–C–244, 74–C–278 and 75–C–430.

Bruce E. Pindyck & James E. Tolan, Olwine, Connelly, Chase, O'Donnell & Weyher, New York City, for Dryfoos & Co. and defendants in 73–C–382, 74–C–178 and 74–C–232.

Benjamin P. Abney, Chapel, Wilkinson, Riggs & Abney, Tulsa, Okl., for Barnett and defendants in 73–C–377 and 73–C–382.

David N. Ellenhorn, Moses & Singer, New York City, for Klineman and defendants in 73–C–377, 73–C–382 and 74–C–178.

John R. Richards, Tulsa, Okl., for McKee, Atkins and Schuler and defendants in 74–C–228.

Wm. S. Hall, John R. Woodard, III, Green, Feldman & Hall, Tulsa, Okl., for Wm. Murray, Murray, Patterson and Sharpe and defendants in 73–C–377, 73–C–382 and 74–C–231.

Thomas R. Sheridan, Simon & Sheridan, Los Angeles, Cal., for Ganong, Lewis and Ganong.

Marvin R. Barnett, pro se.

Joseph R. Roberts, Rhodes, Hieronymus, Holloway & Wilson, Tulsa, Okl., for E. M. Kunkel and defendants in 75–C–413.

James L. Kincaid, Horace D. Ballaine and James R. Ryan, Tulsa, Okl., for First Nat. Bank, Tulsa and defendants in 75–C–430.

John E. Barry, Tulsa, Okl., for Home-Stake and defendants in 74–C–151.

## OPINION AND ORDER RE CLASS ACTIONS

BOLDT, District Judge, By Designation.

The *Anixter, Luce* and *Robertson* ("ALR") plaintiffs[1] in the four above-captioned actions have moved for orders determining that those actions shall proceed as class actions. Further, they seek determinations, in each case, that the classes consist of all persons or entities who purchased participating interests ("units") in oil or gas drilling programs offered by Home-Stake Production Company (hereinafter Home-Stake) or its subsidiaries and who were holders of such units as of September 20, 1973, and the successors in interest of such purchasers who acquired such units by operation of law or by gift and held them as of that date.

The initial class action motion was brought on in the two *Anixter* cases, captioned above, and was opposed by both the Anderson plaintiffs[2] and the Attorney defendants.[3] After full consideration of the motion, memoranda, affidavits, exhibits and oral argument by all parties, the undersigned lodged with the Clerk of the Court and delivered to counsel—but did not file—a proposed draft opinion and order to the effect that class action treatment in the two *Anixter* cases was justified, albeit on a basis different in certain major respects from the treatment sought by the *Anixter* plaintiffs.

Since the circulation of the proposed draft opinion and order, the *Anderson*

---

1. Sixteen plaintiffs in the above-captioned four actions who jointly sought class certification for all those actions shall be referred to collectively as the "ALR" plaintiffs.

2. Approximately 104 plaintiffs in nine lawsuits in this litigation, referred to collectively as the "Anderson plaintiffs."

3. Defendants William Blum, Harry Heller, Simpson Thacher & Bartlett, Kothe & Eagleton, Inc., and McAfee, Taft, Mark, Bond, Rucks & Woodruff, all of whom oppose class certification for the *Anixter* actions, shall be referred to as the "Attorney Defendants."

plaintiffs, together with all other plaintiffs of record in this litigation, have decided to support class action treatment, with the Court's suggested modifications, for all four actions in which such treatment was sought. Certain of the *Anderson* and other plaintiffs, while retaining claims in their non-class-action litigation, have also intervened in the class actions and sought representative status along with the *ALR* plaintiffs. A plaintiffs' committee of counsel has been formed, with the approval of the court, to prosecute these four cases as class actions.

The two accounting firm defendants in the *Luce* and *Robertson* actions, Arthur Andersen & Co. and McKee, Atkins and Schuler (hereinafter the "Accounting Firm defendants"), have opposed class certification in those actions.

With the modifications herein stated, the *ALR* plaintiffs' motions for class certification are granted and the classes are certified pursuant to Rule 23(b)(3).[4]

## I. *FACTUAL BACKGROUND*

In the early 1950's, Robert S. Trippet organized Home-Stake to develop oil and gas properties. Capital to exploit these properties was raised by selling percentage interests or units of participation to investors through private placements. Beginning in 1964, and each year thereafter through 1972, Home-Stake organized separate annual programs, units in which were registered with the Securities and Exchange Commission (hereinafter SEC) and sold to the public by a prospectus. Each of these nine programs purportedly was organized to develop a particular oil and gas property or properties in the Midwest, California or Venezuela. The properties in each program were to be developed by a separate Program Operating Corporation (hereinafter POC), a wholly-owned subsidiary of Home-Stake organized for that specific purpose. Each POC, with the aid of various defendants in each year, caused a registration statement to be prepared and filed with the SEC for the sale of units in the program that it was operating.

Units in each program were allegedly sold in one year only. The marketing effort for each year's program included the selection of oil properties, the preparation of sales materials and registration statements, and the selling of units through a network of sales representatives. The personnel involved and the efforts expended by them for each year's program changed somewhat from year to year, but plaintiffs allege that the format used to sell the program each year remained essentially the same.

Units were sold through personal contacts with potential investors by Home-Stake sales personnel who utilized written sales materials, which from 1964 through 1970, included unregistered "black books." For all practical purposes, each "black book" apparently served the same sales function as a prospectus. These "black books" provided general description of the programs, explained the nature of participating interests therein, and contained engineering reports for each of the properties, descriptions of the tax advantages of participating in a program and projections of substantial profits to participants that differed for each program. Although a prospectus was filed with the SEC each year, they were not usually made available to investors except on specific request and, therefore, the "black books" were the principal selling tool for each program in which they were used. The "black books" were abandoned in 1971 following SEC action that sought to enjoin the use of such unregistered sales materials. The disposition of the SEC's suit required a "rescission offer" to be made to each participant in the 1970 program who had bought units in reliance on the 1970 "black book," and enjoined similar future sales efforts.

---

**4.** While the *Anixter* plaintiffs sought the determination of a class pursuant to Rule 23(b)(1)(B) and 23(b)(3), this Court finds that a class certification under Rule 23(b)(1)(B) is inapplicable for this litigation for reasons to be discussed *infra*.

## II. *PROCEDURAL BACKGROUND*

The 1971 SEC lawsuit did not disclose any of the fraud presently alleged in Home-Stake's operations by plaintiffs. Home-Stake's quarterly progress reports indicated that substantial oil was being produced and early investors received large payments that purportedly were proceeds from oil drilling programs. However, it is alleged that while very little oil was being produced, and although Home-Stake itself made "investments" in the 1970, 1971 and 1972 programs, "profits" were paid quarterly to participants in each program for the entire nine-year period. The source of the "profits" and "investments" ostensibly derived from these oil and gas drilling ventures, plaintiffs allege, actually was the monies received by Home-Stake from later investors for sales of subsequent oil drilling participation units. Plaintiffs aver that the funds collected by the POC's as a result of the annual securities offerings were not segregated for use in developing particular oil properties as had been represented, but were commingled with the general funds of Home-Stake and dissipated or paid out in the form of "profits" to keep the unsuspecting investors content. The amounts returned to participants as "profits" varied from participant to participant within a single program, usually bearing no relation whatever either to the amount of oil reportedly produced or to the amount of money invested by the participants. Plaintiffs allege that only relatively small amounts of money, which varied from program to program, were invested in oil recovery and those investments were for the most part unsuccessful because the oil properties were not economical to operate in the first place. In addition, it is alleged that there was substantial self-dealing on the part of certain Home-Stake officers and employees, which diminished the assets that they were protecting as fiduciaries. The "Ponzi" scheme, which is alleged to have been utilized to varying degrees in each of the nine annual programs, allegedly was utilized for two purposes: (1) to conceal the fact that Home-Stake was not investing the participation unit monies obtained from investors to produce oil and gas; and (2) to encourage investors to invest or increase their investment in subsequent oil and gas ventures.

Since there is alleged to have been no real profit from oil operations, each succeeding year reaped far less "profits" for investors than the representations defendants made to them. These relatively low levels of return on investments led to a number of complaints to Home-Stake management. Various efforts were made to deal with those complaints. In some cases, the Home-Stake companies repurchased program units from those dissatisfied; in others, the companies offered dissatisfied investors the opportunity to "roll over" their units, typically exchanging units in a past program for units in the program that was currently being marketed.

Nevertheless, in late 1972, these efforts to satisfy disgruntled Home-Stake investors proved ineffective. On March 30, 1973, the late Blanche Dickinson and Dolly K. Yoshida (now known as Dolly K. Martin), two investors who were dissatisfied with their investment returns, and Ivan A. Anixter, an investor who had been informed by the Internal Revenue Service that the latter was about to disallow his intangible drilling tax deductions, instituted the *Anixter v. Home-Stake Production Company, et al.* action ("*Anixter I*") in the Northern District of California on behalf of a class of all participants in the various Home-Stake programs. Numerous other participants in programs from 1964 to 1972 were later joined as plaintiffs. Named as defendants are Home-Stake Production Company, the 1964 through 1972 Program Operating Corporations, certain former officers and directors of Home-Stake, and various attorneys, accountants, geologists and others, all of whom are alleged to have performed services for Home-Stake in connection with the sale or valuation of its securities for the various annual programs.

Plaintiffs in *Anixter I* allege violations of the Securities Act of 1933 (15 U.S.C. § 77d, *et seq.*), the Securities Exchange Act of 1934 (15 U.S.C. § 78a, *et seq.*), and common law fraud by claiming that defendants en-

gaged in an unlawful combination, conspiracy and course of conduct that operated as a fraud and deceit upon plaintiffs and the class members they seek to represent, and that defendants made untrue statements or omitted to make disclosures of material facts so as to induce plaintiffs and members of the class they seek to represent to purchase oil and gas participations from Home-Stake and from its various POC's.

In *Anixter I, inter alia,* plaintiffs pray for damages and an accounting on behalf of parties who have been damaged by the activities and practices of defendants, and who are (1) purchasers of participating interests in oil and gas drilling programs offered by Home-Stake or its POC's from 1960 through 1972, who continued to hold such interests until September 20, 1973, and (2) all other current holders of participating interests in oil and gas programs offered by Home-Stake and its subsidiaries, who obtained their interests either by operation of law or by gift from a purchaser of such interest. Specifically excluded from the class are all the defendants named therein, the officers and directors of Home-Stake or any of its subsidiaries, and all persons who have received sales commissions, salaries, gifts or other consideration in any form from Home-Stake or any of its subsidiaries because of their efforts in connection with the sale of any Home-Stake company of participating interests to investors and against whom the members of the class herein may have a right to assert a claim for damages.

By July of 1973, the plaintiffs in *Anixter I* sought to inspect Home-Stake's documents and the court ordered that plaintiffs be allowed to commence discovery. At this point, the pace of events accelerated and the fabric that once held Home-Stake together began to fray. Within weeks, new management controlled Home-Stake and ousted its founder and chairman, Robert S. Trippet. The SEC began an investigation of the company that culminated on September 20, 1973, when Home-Stake filed a petition for reorganization under Chapter X of the Bankruptcy Act in the Northern District of Oklahoma, and various individuals who had been managing the Home-Stake companies resigned.[5]

Similar to *Anixter I,* a few lawsuits had been commenced in various federal district courts before the revelations and collapse of Home-Stake in late 1973, although most of the actions involved in this litigation were instituted subsequent to those events. In January 1974, the Judicial Panel on Multidistrict Litigation transferred two actions to the Northern District of Oklahoma for coordinated or consolidated pretrial proceedings with four other actions pending in this district pursuant to 28 U.S.C. § 1407, and later assigned these lawsuits to the undersigned Judge, sitting by designation under 28 U.S.C. § 292(d).[6] At the end of 1974, a federal grand jury in the Central District of California returned indictments against thirteen ex-officers and associates of Home-Stake for alleged violations of the federal securities laws and income tax laws.

On April 22, 1974, Ivan A. Anixter and William Grohne filed a civil action "*Anixter II*" in the Northern District of California against Harry Heller, individually and as a partner in the law firm of Simpson Thacher & Bartlett, Simpson Thacher & Bartlett, a partnership, William Blum, and McAfee, Dudley, Taft, Cates & Mark, a partnership. Several other participants in the 1970 program later intervened as plaintiffs. Plaintiffs in that action allege violations of the Securities Act of 1933 (15 U.S.C. § 77d, *et seq.*) and the Securities Exchange Act of 1934 (15 U.S.C. § 78a, *et seq.*), claiming the rescission offer prospectus issued by Home-Stake's 1970 Program Operating Corporation in 1971 contained untrue statements or omitted to make disclosure of material facts and that these defendants either knew or should have known of these misstatements

---

5. Since the filing of the bankruptcy proceedings, the Home-Stake companies have been displaced as the oil field operators for, and participants in, various annual oil drilling programs.

6. Subsequently, approximately twenty more actions were instituted in the Northern District of Oklahoma and two others were transferred to this forum pursuant to 28 U.S.C. § 1404(a).

or omissions. Plaintiffs seek as relief for these alleged violations, *inter alia,* damages on behalf of parties who did not accept the rescission offer of Home-Stake's 1970 Program Operating Corporation contained in the registration statement and prospectus dated April 22, 1971. This action also was transferred to the Northern District of Oklahoma for coordinated or consolidated pretrial purposes by the Judicial Panel on Multidistrict Litigation pursuant to 28 U.S.C. § 1407.

On September 19, 1975, two additional civil actions were filed in the Northern District of Oklahoma by plaintiffs who were already parties in *Anixter I.* Peter Paul Luce and the executors of the estate of Blanche Dickinson (Walter S. Furlow, Jr. and Louis C. Paladini) filed one of these actions (*"Luce"*) against Arthur Andersen & Co., a partnership. William D. Robertson and the Dickinson executors filed the other action (*"Robertson"*) against McKee, Atkins & Schuler, a partnership. Several other *Anixter I* plaintiffs later intervened in *Luce* and/or *Robertson.*

In both of these actions, in substantially identical complaints, plaintiffs allege violations of the Securities Exchange Act of 1934 (15 U.S.C. § 78a, *et seq.*), claiming that both defendant accounting firms, with actual knowledge of Home-Stake's consistent oversales of program units, its failure to spend development moneys as represented, and its substantial contingent liabilities, failed to disclose these material facts in connection with sales of units in the 1967 and 1968 programs. Hence, it is alleged, these firms joined in a conspiracy and fraudulent course of conduct with respect to sales of those program units, and conspired to conceal the true facts from investors in prior programs.

## III. *CLASS ACTION CERTIFICATION*

### A. *Rule 23(a) Requirements*

In deciding whether an action should be permitted to proceed as a class action, F.R. Civ.P. 23 requires this Court to determine that all requirements enumerated in subdivision (a) of that Rule—numerosity, commonality, typicality and representativeness—have been established of record. Each of those prerequisites will be discussed separately.

### 1. "Numerosity"

This requirement is satisfied when it is shown that "the class is so numerous that joinder of all members is impracticable." *Green v. Wolf Corp.,* 406 F.2d 291 (2d Cir. 1968), *cert. denied,* 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969); *Lewis v. Bogin,* 337 F.Supp. 331 (S.D.N.Y.1972); *Weiss v. Tenney Corp.,* 47 F.R.D. 283 (S.D.N.Y.1969); *Fed.R.Civ.P.* 23(a)(1). In the instant matter, at least 3,000 potential class members exist since approximately that number of Home-Stake participants have filed claims in Home-Stake's bankruptcy proceedings, while approximately 140 plaintiffs have instituted individual lawsuits. Even if joinder was possible, such a technique would be both (1) impractical, because the potential class members are dispersed throughout the nation, and (2) inequitable since approximately 180 Home-Stake participants have invested less than $5,000 in their respective programs, while approximately 1,080 similar participants have a total investment of less than $20,000 in Home-Stake programs. The economic reality of this situation is that these relatively small investments in Home-Stake programs preclude joinder.

The fact that the precise number of potential members of the class cannot be ascertained does not bar a class action certification. As the court noted in *Herbst v. Able,* 278 F.Supp. 664 (S.D.N.Y.1967), there is no need to state the exact number and identity of every class member because to do so would frustrate the purpose of class actions when recoveries may be numerous but small. Based upon the current identification of allegedly injured Home-Stake participants, there is ample justification for the court finding and holding that the requirement of "numerosity" is fully established.

### 2. "Commonality"

The second prerequisite is that questions of law and fact exist common to the

potential class members. *In Re Penn Central Securities Litigation,* 347 F.Supp. 1327 (E.D.Pa.1972); *Siegel v. Realty Equities Corp. of New York,* 54 F.R.D. 420 (S.D.N.Y. 1972); *Cannon v. Texas Gulf Sulphur Co.,* 53 F.R.D. 216 (S.D.N.Y.1971); Fed.R.Civ.P. 23(a)(2). The Court finds and holds that this factor has been established. The instant actions describe Home-Stake as a corporation that engaged in an alleged fraudulent course of oil and gas drilling investment manipulations from 1964 through 1972, which artificially inflated its assets and income and concealed its liabilities. In this respect, other defendants allegedly participated in concert with Home-Stake and aided and abetted in defrauding the investing public concerning Home-Stake's financial condition by material misrepresentations and omissions of fact.

Some of the myriad common issues of law and fact in some or all of these various actions that focus upon Home-Stake's alleged use of its annual program operating subsidiary corporations as alter-egos to offer annual oil and gas drilling programs to the investing public via Home-Stake's registration statements, "black books" and prospectuses are:

(a) Whether the defendants entered into a conspiracy and course of conduct for the purpose of fraudulently inducing plaintiffs and all other members of the putative class to purchase participation units in the Home-Stake annual programs based upon misrepresentations as to available oil reserves, misrepresentations as to the intended use of the proceeds of said programs by Home-Stake and misrepresentations as to the sources of income returned to investors by prior Home-Stake programs;

(b) whether defendants, to effectuate such a conspiracy, engaged in acts and conduct and the distribution of prospectuses, annual reports and written progress reports in violation of Section 10b of the Exchange Act. (15 U.S.C. Section 78j(b)), and Rule 10b–5 promulgated thereunder by the Securities and Exchange Commission;

(c) whether defendants, to effectuate such a conspiracy, and in connection with such a conspiracy, filed registration statements with the Securities and Exchange Commission, which contained untrue statements of material facts or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) whether defendants, to effectuate such a conspiracy, and in connection with such a conspiracy, made representations in writing to participants in the various Home-Stake operating programs with respect to tax benefits available to said participants with full · knowledge that, based upon defendants' contemplated use of the proceeds, such tax benefits would not legitimately be available to participants;

(e) whether defendants, to effectuate such a conspiracy, omitted to state material facts necessary to make statements made, in light of the circumstances under which they were made, not misleading to plaintiffs with respect to the financial condition of Home-Stake Production Company, with respect to the profits of Home-Stake Production Company in prior years' programs, with respect to the use of proceeds of prior years' programs, and with respect to various financial transactions entered into for the benefit of Home-Stake Production Company and its officers and directors with funds received from participants;

(f) whether each of the attorneys, accountants and individual defendants exercised due diligence in their capacity as directors or experts in the preparation of registration statements for the corporate defendants and whether each of the defendants, other than the defendant Home-Stake companies, knew, or in the exercise of ordinary care, should have known of the activities of the defendants and whether each of these defendants participated in the fraudulent scheme set forth herein;

(g) whether the fraudulent practices and devices allegedly utilized by defendants

to effectuate the aforesaid conspiracy consisted, *inter alia,* of misrepresentations of material fact by defendants, known to be false when made, and intentional concealment of and failure to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading to plaintiffs and members of the putative class, all or part of which are contained in the program books published by defendants for the Home-Stake 1964, 1965, 1966, 1967, 1968, 1969 and 1970 programs (the "black books"), the registration statements filed on Form S–1 with the Securities and Exchange Commission and the prospectuses based thereon distributed to investors and potential investors for the 1964 through 1972 programs, the rescission offer made to participants of the 1970 program in 1971 in settlement of an action brought by the Securities and Exchange Commission, and in written annual reports of Home-Stake Production Company and the operation reports distributed to investors in each of the Home-Stake programs;

(h) whether the Home-Stake defendants falsely represented and held themselves out to the public, including the plaintiffs and members of the putative class, as highly successful owners, operators and developers of oil wells and producers of oil therefrom by means of steam-flooding and water-flooding on proven properties; that such operations had returned substantial profits to the defendants and to public participants or investors in oil and gas recovery programs; that the Home-Stake companies had millions of dollars in assets including producing oil wells and equipment; that the management maintained an organization of skilled personnel, and had acquired and was continually acquiring proven oil wells with proven reserves from which substantial quantities of oil remain to be recovered at large profits to participants and investors;

(i) whether defendants further falsely represented to plaintiffs and members of the putative class that, if they would invest in a Home-Stake joint venture, their investment would be devoted to oil drilling programs, that the participants would receive future income based upon oil production achieved and that the participants would receive immediate and substantial tax benefits;

(j) whether defendants prepared, made, circulated and delivered to the public, including the plaintiffs and members of the putative class, various elaborate reports brochures and papers containing the aforementioned false representations in whole or in part, which purported to describe the annual production programs and the profits and tax benefits which investors would receive;

(k) whether defendants also caused to be issued registration statements on Form S–1 as required by the Securities and Exchange Commission, and prospectuses contained therein for the 1964 through 1972 programs, which contained the false representations set forth above;

(*l*) whether defendants, their agents and employees issued progress reports to participants and annual reports of Home-Stake Production Company that falsely indicated that large quantities of oil were successfully being produced, that production was increasing and that quarterly distributions, which were being made to participants in prior year programs, were being made out of oil production revenues;

(m) whether false statements concerning returns on prior year programs were made to investors in registration statements and prospectuses, and whether the participants in these programs received quarterly distributions from Home-Stake of sums of money that purported to constitute a payment of oil production income;

(n) whether the payments made to participants, totalling in excess of $18,000,-000, did not constitute payments of income arising from the recovery of oil, but, in fact, were funds paid to participants by Home-Stake either from income it received by investing funds received from investors, or from capital contribu-

tions of participants in subsequent year programs, which were diverted to this purpose by Home-Stake;

(*o*) whether little or no oil has been produced in any of the programs and whether the vast majority of the funds subscribed by investors have been diverted to the use of Home-Stake, its officers and directors and whether defendants failed to expend the funds received from investors in the oil drilling programs as represented;

(p) whether, in the "black books," in the registration statements and prospectuses, and in the rescission offer, defendants falsely represented to investors that they would achieve immediate tax benefits by being able to deduct all or substantially all of their investment as intangible drilling costs, and whether the Home-Stake defendants in each of the years referred to herein did not expend funds received from investors in a manner that would qualify the investors for a deduction of their intangible drilling expenses;

(q) whether the Internal Revenue Service currently is conducting an audit of Home-Stake and preliminarily has determined that of the $18,000,000 received from investors in the 1970 program, purportedly to be spent by Home-Stake for intangible drilling expenses, less than $3,000,000 has been so expended, and whether plaintiffs and members of the putative class who participated in the 1970 program as well as those participants in the 1971 and 1972 programs are faced with the distinct possibility that their personal income tax deductions for intangible drilling costs claimed at the direction of the defendants will be disallowed by the Internal Revenue Service;

(r) whether other material facts that defendants failed to disclose to plaintiffs and members of the putative class were:

(1) the pendency of a class action in 1968 alleging fraud in the sale of the 1961 and 1962 Home-Stake programs;

(2) that defendant Home-Stake and/or the Home-Stake POCs have refunded large sums of money to certain participants in Home-Stake programs to set-tle threatened litigation that would expose Home-Stake's fraudulent scheme;

(3) that Home-Stake deliberately overstated the amounts to be expended in oil drilling contracts to record on its books substantial profits for Home-Stake from the investments of program participants;

(4) that Home-Stake sold units in the programs in excess of amounts registered with the SEC;

(5) that Home-Stake commingled proceeds from the sales of annual program units with Home-Stake's general revenues;

(6) that Home-Stake falsely altered corporate books and records in an effort to cover up fraudulent oil and gas payments;

(7) that Home-Stake arbitrarily and falsely allocated oil and gas production from the 1963 and 1964 programs to the 1968 and 1969 programs;

(8) that Home-Stake arbitrarily determined the quarterly participant payments paid in varying non-pro-rata amounts according to a preconceived schedule unrelated to the number of units purchased by the investor;

(9) that Home-Stake used numerous devices to satisfy, placate and lull investors who became disenchanted when their quarterly payment did not meet projections promised by the defendants, including, but not limited to, the offer of stock in Home-Stake in exchange for units, the repurchase of units, and allowing the switching of investment in one year's program to another year;

(10) that Home-Stake caused investors to make gifts of their units to charities by having false and misleading evaluation reports prepared describing substantial present value to the investors' unit, thereby allowing an investor to benefit from a large income tax deduction;

(11) that once the assignment of the units was made, the amount of quarterly participant payments with respect to these units was reduced or eliminated;

(12) that Home-Stake had paid illegal commissions to various persons in connection with the sale of participation units; and

(13) that defendant Trippet had entered into a management contract with Home-Stake that granted to Mr. Trippet 50 per cent of Home-Stake's interest in any oil and gas drilling programs sponsored by Home-Stake;

(s) whether Home-Stake financial statements for each of the years in question falsely overstated the earnings, assets and net worth of Home-Stake by inclusion of the following items:

(1) financed equipment receivables which were listed as assets when there was no reasonable probability that this asset would be realized;

(2) the inclusion of reversionary interests of Home-Stake when there was no reasonable grounds to believe that these reversionary interests would be of value; and

(3) the inclusion of various loans receivable when there was no reasonable probability that the amounts due on these loans would be collectible;

(t) whether defendants, Harry Heller, William Blum, William E. Murray, Simpson, Thacher & Bartlett, Murray, Patterson & Sharpe, McAfee, Taft, Mark, Bond, Rucks & Woodruff, and Kothe & Eagleton, Inc., acted as attorneys for defendant Home-Stake and certain of its POCs and wrongfully participated in and aided and abetted the fraudulent conduct of the other defendants in the preparation of registration statements used in connection with the issuance and sale of securities, either with actual knowledge as attorneys of the misrepresentations of material facts and the omission of material facts set forth in the registration statements and prospectuses in which their names appeared, with their consent, or, in the alternative, under circumstances where in the due exercise of their professional responsibilities these attorneys should have known of such material misrepresentations and omissions; and

(u) whether defendant Cross acted as a certified public accountant for Home-Stake and its POCs and whether defendant Cross, Arthur Andersen & Co. and McKee, Atkins and Schuler knew or, with the exercise of reasonable care, should have known that the financial statements and other financial information and data contained in the annual financial reports of Home-Stake for the years 1969 through 1972 and the financial report of Home-Stake included in registration statements filed with the SEC failed to accurately present information with respect to the income, expenditures, assets and liabilities of Home-Stake.

### 3. "Typicality"

 These actions meet the requirements of the third aspect of Rule 23(a) because the claims and defenses, if any, of the representative plaintiffs are typical of the claims and defenses of other investors in the same purported class. *Lewis v. Bogin,* 337 F.Supp. 331 (S.D.N.Y.1972); *Guarantee Insurance Agency Co. v. Mid-Continental Realty Corp.,* 57 F.R.D. 555 (N.D.Ill. 1972); *Wolfson v. Solomon,* 54 F.R.D. 584 (S.D.N.Y.1972); Fed.R.Civ.P. 23(a)(3). On behalf of themselves and all others similarly situated, the representative plaintiffs seek damages for defendants' alleged fraud, and rely on the same alleged broad course of fraudulent conduct to support those contentions. Also similar to the other potential members of the class, they are investors in various programs entered into pursuant to their reliance [7] upon numerous documents

---

7. The Attorney defendants maintain that the named plaintiffs have claims atypical of those of other possible class members because individual proof of reliance is required. For reasons to be stated and discussed *infra,* no individual proof of reliance need be established because of an alleged "common course of fraudulent conduct" by defendant. Even if some particular showing of reliance was required of certain potential class members, the "typicality" of claims among the named and unnamed plaintiffs is not destroyed because a representative's claims or defenses need only be typical of, not identical to, every possible member of a class. *Cottrell v. Virginia Electric & Power Co.,* 62 F.R.D. 516 (E.D.Va.1974); *In*

and oral misrepresentations touting the growth and stability of Home-Stake.

■ Defendants contend, however, that many of the named plaintiffs made their investments in totally disparate ways and thus cannot adequately represent potential class members whose investments were not similarly induced. For example, defendants argue that certain of the proposed class representatives were part of a cohesive investment group, centered in the headquarters of the General Electric Company in New York, which shared information (some of which allegedly was not available to Home-Stake investors who were not a part of the "GE group" and acted as a unit. Defendants also assert, *inter alia,* that numerous proposed class representatives invested in Home-Stake as a result of discussions with and information obtained from personal acquaintances and/or business associates. The court has carefully reviewed and fully considered all the memoranda and supporting documents filed either in support of or in opposition to each of defendants' objections to the "typicality" of the proposed class representatives[8] and finds that these objections are all addressed to vigorously contested factual differences in the claims of individual plaintiffs. Although substantially all potential class representatives have been deposed, deposition discovery on the merits is still at an early stage. Therefore, the court is fully satisfied that these disputed factual issues should not be resolved on the record which is presently before the court.[9] *See Sharp v. Coopers & Lybrand,* 70 F.R.D. 544, 548–49 (E.D.Pa.1976). As Chief Judge Lord appropriately stated in *Dorfman v. First Boston Corporation et al.,* 62 F.R.D. 466 at 477–78 (E.D.Pa.1973): "[I]t is far preferable to reach the merits by means of summary judgment or, if necessary, at trial than it is to transform a motion for class action determination into a miniature trial of the merits."

For these reasons, the named plaintiffs have claims against the various defendants that are typical of other possible class members.

■ The *Anderson* plaintiffs and the Attorney defendants originally opposed the *Anixter* plaintiffs' proposed class action because, among other reasons, the wrongs which are complained of are alleged by the *Anixter* plaintiffs to have been committed in the course of a massive conspiracy over ten years to defraud the investing public. These class action opponents assert this "conspiracy" theory is of questionable validity and, therefore, the *Anderson* plaintiffs have not alleged this concept in their complaints in non-class litigation. Hence, these opponents contended that the *Anixter* plaintiffs' conspiracy claim was not representative of the claims of some of the proposed class members. Regardless of the manner in which the *Anixter* plaintiffs designate certain of their allegations or theories, after a thorough review of the complaints, other pleadings and voluminous memoranda that have been submitted by plaintiffs in support of the various class certification motions, this Court is satisfied that all plaintiffs—including plaintiffs in *Luce* and *Robertson*—are alleging a "common course of fraudulent conduct" on the part of Home-Stake, its subsidiary companies, attorneys, accountants and geologists. Thus, this Court finds and holds there is ample typicality in the claims of the representative plaintiffs.

re Four Seasons Securities Laws Litigation, 59 F.R.D. 667 (W.D.Okl.1973).

**8.** The court notes that many similar objections recently were raised and rejected in *Arthur Young & Co. v. United States District Court,* 549 F.2d 686, 689–90 (9th Cir. 1977).

**9.** Defendants also contend that many of the named plaintiffs would be inadequate class representatives because their claims may be found to be barred under the appropriate statute of limitations. The court has already ruled, however, that "[c]onsidering the exceptional complexity of the fact issues involved in the determination of limitations, rulings thereon should and will be deferred until the relevant facts are more fully developed during pretrial discovery." *In re Home-Stake Production Company Securities Litigation,* MDL–153, 76 F.Supp. 337 (N.D.Oklahoma, order filed August 6, 1975).

#### 4. "Representativeness"

Finally, this Court finds and holds that the plaintiffs in this litigation are representative parties who will fairly and adequately protect the interests of other unnamed plaintiff securities holders. *Herbst v. Able,* 278 F.Supp. 664 (S.D.N.Y.1967); *Rosenblatt v. Omega Equities Corp.,* 50 F.R.D. 61 (S.D.N.Y.1970); F.R.Civ.P. 23(a)(4).

██ The requirement of "adequate representation" is composed of two elements: (1) the interest of the representative party or parties must coincide with that of the potential class; and (2) the representative party or parties must vigorously prosecute the action. *Dolgow v. Anderson,* 43 F.R.D. 472 (E.D.N.Y.1968). Defendants challenge both elements, stating each of the plaintiffs in this litigation has conflicting interests with any possible class member and that these antagonistic interests will prevent plaintiffs from exerting their best efforts on behalf of other similarly situated securities holders. Since the "representativeness" requirement is one of the most critical factors that must be satisfied before class action certification can be granted, defendants' ·objections have been fully reviewed and considered by the Court.

██ Defendants suggest several purported "conflicts" of interest between the proposed representative plaintiffs and the classes they seek to represent.[10] One asserted conflict is that the proposed plaintiff class members' claims under Sections 11 and 12 of the Securities Act of 1933 are not typical of the proposed class members' claims seeking recovery for fraud under Section 10(b) of the Securities Exchange Act of 1934 and that claims under both cited sections cannot be included in the same class action.

██ Statutory causes of action pursuant to Sections 11 and 12 of the Securities Act of 1933 are directed at specific prospectuses and registration statements prepared and disseminated by one or more defendants. All purchasers of securities issued under these statements may sue the issuer, any persons who signed the registration statement and any experts whose identities appear in those documents with their consent. Consequently, no conflict will exist between plaintiff representatives and the class members since all these purchasers seek to predicate defendants' liability upon the falsity or omission of representations appearing in various documents disseminated by Home-Stake and other defendants.

██ A second purported "conflict" is based on the "damages" issue. It is asserted that different investors purchased units in various annual programs and that, consequently, conflicts exist among class members based upon disparities regarding their purchases: whether certain class members received disproportionate distributions from Home-Stake; whether certain members received non-recourse loans; and whether certain purchasers exchanged or "rolled-over" their units from one program to another. This Court recognizes this conflict concerning the distribution of damages, if any, to class members, and is mindful that certain participants should not be favored in the allocation of recoveries to the detriment of other purchasers. Given the fiduciary relationship of Home-Stake with its participants in partnerships or joint ventures, recovery, if any, should not be restricted to those purchasers who have instituted individual actions and, hence, class actions are mandated to achieve justice among all purchasers. This is one of the reasons why several classes have been certified, *infra,* so that conflicts between program participants may be avoided on the "damages" question by creating adjustments to reflect any preferential treatment or benefits accorded certain participants in the past by Home-Stake.

---

10. Defendants assert that the several potential class representatives who are also prosecuting their own individual actions may be subject to conflicts of interest and thus are inadequate ·class representatives. In Pretrial Order No. 7, filed on July 2, 1976, the court found and held that no showing of actual prejudice resulting from the prosecution of these individual actions had been made. Defendants have again failed to make such a showing here.

The Court has a wide choice of procedures in determining individual damages for substantial numbers. The fact of large numbers of claimants and individual damage questions does not convince this Court that class action in this litigation is inappropriate.

In addition, defendants allege a variety of other conflicts directed at the representative status of certain of the proposed class representatives. For example, defendants assert that: (1) several of the proposed class representatives themselves received special preferential treatment from Home-Stake and therefore are not eligible to serve as class representatives; (2) at least one proposed class representative is inadequate because he may have induced other plaintiffs to invest in Home-Stake and may be subject to claims by these plaintiffs; and (3) those proposed class representatives who were members of the so-called "GE group" might ultimately favor the interests of that group over the interests of other class members.

The court is convinced that defendants' objections concerning the representativeness of the proposed class representations must be rejected for the same reasons that defendants' Rule 23(a)(3) objections were found to be without merit. *See* p. 366, *supra.*

The second requirement of "adequate representation"—that the representatives of the proposed classes must prosecute vigorously the action—has also been met. The representative plaintiffs have a substantial monetary investment, and a strong incentive to vigorous prosecution of their claims and those of the class they are appointed to represent. The counsel that the representative plaintiffs have retained are highly competent, industrious and have in depth knowledge and experience in this litigation almost from its inception.

### B. *Rule 23(b)(3) Requirements*

In addition to the mandate of Rule 23 that all of the prerequisites of subdivision (a) be satisfied before an action may be maintained as a class action, the Court must determine whether plaintiffs have met their burden of establishing that (1) "questions of law or fact common to the members of the class predominate over any questions affecting only individual members," and that (2) "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." *Green v. Wolf Corp.,* 406 F.2d 291 (2d Cir. 1968), *cert. denied,* 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969); *Brennan v. Midwestern United Life Insurance Co.* 286 F.Supp. 702 (N.D.Ind.1968), *aff'd,* 417 F.2d 147 (7th Cir. 1969), *cert. denied,* 397 U.S. 989, 90 S.Ct. 1122, 25 L.Ed.2d 397 (1970); *Fischer v. Kletz,* 41 F.R.D. 377 (S.D.N.Y.1966); F.R. Civ.P. 23(b)(3).

1. "Common Questions of Law or Fact Must Predominate Over Individual Questions"

Plaintiffs assert that common issues of law and fact exist and predominate over individual questions because of an alleged broad course of fraudulent and negligent conduct by defendants. The Attorney defendants counter this contention by arguing that defendants did not participate in any consistent course of conduct throughout the relevant period because the various alleged misrepresentations and omissions that occurred over several years about different transactions were transmitted through dissimilar media to varying parties at different times. Consequently, the opponents maintain, no common factual or legal questions can predominate over individual issues.

Initially, the Attorney and accountant defendants assert that Rule 10b–5 litigation requires each potential class member to establish that he "relied" on a misrepresentation allegedly made by a defendant. From this assumption, opponents proceed to argue that such evidence of reliance precludes class treatment since questions affecting only individual members predominate over common questions of law or fact. Secondly, they contend that individual and not common factual and legal questions predominate because an action under Rule 10b–5

requires a demonstration by each claimant of the "materiality" of the alleged misrepresentations or omissions made by defendants to that investor. In addition, they argue the issues of negligence, "statute of limitations," and "damages" preclude the possibility of a predominance of common factual and legal questions for these putative class actions.

 As previously specified, this Court finds the existence of myriad common factual and legal questions concerning various events at Home-Stake in each of the relevant years. The existence of this alleged "Ponzi" scheme itself constitutes the necessary "common course of fraudulent conduct" that creates the predominance of common factual and legal issues. It is conceded that different oral representations were made to various Home-Stake purchasers and that Home-Stake tailored its approach to the needs of particular investors.[11] Nevertheless, so long as the fundamental nature of Home-Stake's operation was not disclosed, and so long as the allegations in the four complaints, which must be taken as true for purposes of determining whether a class action should be ordered, allege facts demonstrating a common and interrelated course of fraudulent conduct, any individual issues relative to fact or law are far outweighed by common questions. *See e.g., Green v. Wolf Corp.,* 406 F.2d 291 (2d Cir. 1968); *Frankel v. Wyllie and Thornhill, Inc.* 55 F.R.D. 330 (W.D.Va.1972); *Siegel v. Realty Equities Corp.,* 54 F.R.D. 420 (S.D.N.Y.1972); *Vernon J. Rockler & Co. v. Graphic Enterprises, Inc.,* 52 F.R.D. 335 (D.Minn.1971); *Northern Acceptance Trust 1065 v. AMFAC, Inc.,* 51 F.R.D. 487 (D.Hawaii 1971); *Weiss v. Tenney Corp.,* 47 F.R.D. 283 (S.D.N.Y.1969); *Fischer v. Kletz,* 41 F.R.D. 377 (S.D.N.Y.1966); *Kronenberg v. Hotel Governor Clinton, Inc.,* 41 F.R.D. 42 (S.D.N.Y.1966). As the Court stated in *Fischer v. Kletz, supra,* at 381:

> "Like standing dominoes, however, one misrepresentation in a financial statement can cause subsequent statements to fall into inaccuracy and distortion when considered by themselves or compared with previous statements."

The language of Rule 10b–5(a) and (b) makes it unlawful "to employ any device,

---

11. Defendants contend that cases involving oral misrepresentations have often been found inappropriate for class certification because oral misrepresentations are susceptible of material variations from class member to class member. *See, e.g., Simon v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 482 F.2d 880 (5th Cir. 1973); *McMerty v. Burtness,* 72 F.R.D. 450 (D.Minn.1976); *In re Scientific Control Corp. Securities Litigation,* 71 F.R.D. 491 (S.D.N.Y. 1976); *Amswiss International Corp. v. Heublein, Inc.,* 69 F.R.D. 663 (N.D.Georgia 1975). In the cases now before the court, however, plaintiffs assert that the oral misrepresentations were part of standardized sales technique and were made pursuant to a common scheme and course of conduct which did not vary *materially* among Home-Stake investors. While any factual determination of the merits at this stage of the proceedings is clearly prohibited by *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), it is significant that the limited discovery conducted to date indicates that Home-Stake salesmen utilized a "sales kit" for each annual offering and that sales meetings outlining the upcoming year's program to Home-Stake salesmen were held annually. *See Grainger v. State Security Life Insurance Co.,* 547 F.2d 303, 307 (5th Cir. 1977). Moreover, plaintiffs contend that their claims are grounded primarily on misrepresentations and omissions contained in a common core of documents, and the court notes that the complaints in these actions do not include allegations concerning any specific oral statements or misrepresentations. *See Sharp v. Coopers & Lybrand,* 70 F.R.D. 544 (E.D.Pa.1976). Under these circumstances, the court finds that the presence of alleged oral statements and misrepresentations does not preclude class certification in these actions at this time. *See, e.g., Sharp v. Coopers & Lybrand, supra; Ramsey v. Arata,* 406 F.Supp. 435 (N.D.Texas 1975); *Jenson v. Continental Financial Corporation,* 404 F.Supp. 806 (D.Minn.1975); *Fox v. Prudent Resources Trust,* 69 F.R.D. 74 (E.D.Pa. 1975); *Davis v. Avco Corp.,* 371 F.Supp. 782 (N.D.Ohio 1974); *Frankel v. Wyllie & Thornhill, Inc.,* 55 F.R.D. 330 (W.D.Va.1972); *Vernon J. Rockler and Co. v. Graphic Enterprises, Inc.,* 52 F.R.D. 335 (D.Minn.1971).

If, at a later stage, it becomes apparent that plaintiffs will rely on oral statements and misrepresentations in order to establish their claims and that the oral statements and misrepresentations varied materially from class member to class member, decertification of these classes or the certification of appropriate subclasses may, of course, become appropriate.

*scheme* or artifice to defraud" or "to engage in any act, practice, or *course of business* which operates or would operate as a fraud or deceit upon any person." (Emphasis added.) Pursuant to this Rule, the relevant inquiry could focus upon the existence of a broad course of fraudulent conduct, which, in the instant action, has been alleged by use of the word "conspiracy." Although defendants are charged with having been negligent and fraudulent in specific instances in connection with Home-Stake's financial condition, all of these separate acts, taken together, form a "course of business" or "scheme" to defraud investors. Therefore, proof of this element is both relevant and common to the claims of each potential class member in every class. *See Cameron v. E.M. Adams & Co.,* 547 F.2d 473, 476–77 (9th Cir. 1976); *Friedlander v. City of New York,* 71 F.R.D. 546, 549–50 (S.D.N.Y.1976); *Clark v. Cameron-Brown Co.,* 72 F.R.D. 48, 58–59 (M.D.N.C.1976); *Weiss v. Drew National Corp.,* 71 F.R.D. 429, 430 (S.D.N.Y.1976) and cases cited therein; *Lorber v. Beebe,* 407 F.Supp. 279, 289, 296 (S.D.N.Y.1976); *Muth v. Dechert, Price and Rhoads,* 70 F.R.D. 602, 607 (E.D. Pa.1976).

The *Anderson* plaintiffs argued in connection with the *Anixter* motion and the Attorney and Accountant defendants argue that common questions do not predominate over individual ones because great variations exist in the alleged information either withheld or misrepresented. In addition the Attorney and Accountant defendants point to variations in the degree of "reliance" by investors.

These defendants state that many of the plaintiffs' claims in the *Anixter* actions, *Luce* and *Robertson* are based on affirmative misrepresentations, see pp. 362–365 *supra,* and contend that many of the alleged omissions in plaintiffs' complaints are also more properly characterized as affirmative misrepresentations. Thus, these defendants argue, individual questions of fact will predominate because each class member must prove reliance on the defendants' alleged fraudulent conduct in order to demonstrate that such conduct in fact caused plaintiff's loss. Defendants rely, *inter alia,* on *Holdsworth v. Strong,* 545 F.2d 687 (10th Cir. 1976), in which the Tenth Circuit stated:

> Where, as here, there are affirmative misrepresentations, . . . reliance is the appropriate and decisive way to prove the chain of causation [citation omitted]. Unquestionably the proof of reliance or materiality is essential to the case where it is a positive misrepresentation type of action and justifiable reliance is the required element. [citations omitted]. *Id.* at 695.

■ Although the complaints in the actions before the court plead both misrepresentations and nondisclosures, the court is convinced that the primary causation issues for most of the claims in these actions will be the materiality of the information allegedly not disclosed to plaintiffs. See *Arthur Young & Co. v. United States District Court,* 549 F.2d 686, 694 (9th Cir. 1977). Differentiating between "misrepresentations" and "omissions" on the record to date in this litigation is, however, not an easy task. In *Little v. First-California Company,* 532 F.2d 1302, 1304 n. 4, the court stated:

> The categories of 'omission' and 'misrepresentation" are not mutually exclusive. All misrepresentations are also non-disclosures, at least to the extent that there is failure to disclose which facts in the representation are not true. Thus, the failure to report an expense item on an income statement, when such a failure is material in the *Affiliated Ute* sense . . . can be characterized as (a) an omission of a material expense item, (b) a misrepresentation of income, or (c) both. There is a true dilemma presented in a case in which there has been a general representation from which material facts are omitted and there is no independent alternative ground, such as an "open market" situation, that justifies dispensing with a requirement that plaintiffs show individual reliance . . . we feel the conceptual problem should be explicitly recognized as one in which there is no

completely just solution. *But see Blackie v. Barrack,* 524 F.2d 891, 905–06 (9th Cir. 1975).[12]

Some courts have held that individualized proof of reliance must be presented unless plaintiffs' claims are grounded on nondisclosures unaccompanied by any representations whatsoever. *See, e.g., Lorber v. Beebe,* 407 F.Supp. 279, 289 (S.D.N.Y.1975); *Herzfeld v. Laventhol, Krekstein, Horwath and Horwath,* 378 F.Supp. 112, 127 (S.D.N.Y.1974). Other courts have held that where a plaintiff alleges both misrepresentations and nondisclosures, reliance is not an essential element of a claim for damages under Section 10(b) and Rule 10b–5 and may be inferred from a showing of materiality if plaintiffs "complain primarily of defendants' withholding relevant information . . . ."[13] or if "the essence of the claim is one of nondisclosure . . . ."[14] *See also Arthur Young & Co. v. United States District Court, supra,* 549 F.2d 688, 689, 694; *Blackie v. Barrack, supra,* 524 F.2d 905–06; *Competitive Associates, Inc. v. Laventhol, Krekstein, Horwath & Horwath et al.,* 516

F.2d 811, 814 (2d Cir. 1975)[15]; *Clark v. Cameron-Brown Co.,* 72 F.R.D. 48, 57–59 (M.D.N.C.1976); *Sharp v. Coopers & Lybrand,* 70 F.R.D. 544, 547 (E.D.Pa.1976); *Seiffer v. Topsy's International, Inc.,*64 F.R.D. 714, 718 (D.Kan.1974), *appeal dismissed,* 520 F.2d 795 (10th Cir. 1975), *cert. denied,* 423 U.S. 1051, 96 S.Ct. 779, 46 L.Ed.2d 640 (1976). The court finds these latter cases more persuasive, particularly because plaintiffs in the four actions before the court assert that their claims are premised principally upon defendants' omissions. Memorandum of Plaintiffs at 3, 18, 25–26, *In re Home-Stake Production Company Securities Litigation* (MDL–153) (N.D. Okla., brief filed May 23, 1977; Reply Memorandum of Plaintiffs at 5–18 (brief filed June 15, 1977). As the court stated in *Spector v. City of New York, supra,* 71 F.R.D. 552:

[T]o the extent that the complaint may support other theories of action, I deem it appropriate to defer to plaintiffs' interpretation of their own case. By seeking

---

**12.** In *Blackie v. Barrack, supra,* the Ninth Circuit stated:

> Individual questions of reliance are likewise not an impediment—subjective reliance is not a distinct element of proof of 10b–5 claims of the type involved in this case. *The class members' substantive claims either are, or can be, cast in omission or nondisclosure terms*—the company's financial reporting failed to disclose the need for reserves, conditions reflecting on the value of the inventory, or other facts necessary to make the reported figures not misleading. The [Supreme] Court has recognized that under such circumstances
> 'involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision. This obligation to disclose and this withholding of a material fact establish the requisite element of causation in fact.' (citations omitted)
> *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 153–154, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972). *See U.S. Financial Securities Litigation,* [64 F.R.D. 443, 451 (S.D.Cal.1974)]; *Caesars Palace Securities Litigation,* [360 F.Supp. 366, 399 (S.D.N.Y. 1973)]; *In re Penn Central Securities Litiga-*

tion, 347 F.Supp. 1327, 1344 (E.D.Penn.1972). (Emphasis added.)

**13.** *Cameron v. E. M. Adams & Co.,* 547 F.2d 473, 477 (9th Cir. 1976).

**14.** *Spector v. City of New York,* 71 F.R.D. 550, 552 (S.D.N.Y.1976).

**15.** In *Competitive Associates,* the Second Circuit held:

> [A] showing of reliance is not required where a comprehensive scheme to defraud which includes not only omissions and misrepresentation, but substantial collateral conduct as well, is alleged. [Citation omitted.] Not every violation of the anti-fraud provisions of the federal securities law can be, or should be, forced into a category headed 'misrepresentations' or 'nondisclosures'. Fraudulent devices, practices, schemes, artifices and courses of business are also interdicted by the securities laws. In the case before us, plaintiff has charged the accounting defendants not only with affirmative misrepresentations in the financial statements, but also with a failure to disclose the true financial condition of Takara Partners and the alleged receipt of payoffs in return for its certification; furthermore, both misrepresentations and omissions are alleged to be only one aspect of an elaborate scheme to defraud.

class status, plaintiffs have in effect opted to rely upon the nondisclosure theory. They cannot hope to succeed on the merits, as a class action, solely on the basis of alleged individual misrepresentations.

▉▉ While the court is thus convinced that reliance may be proven on a class-wide basis in this litigation, *see supra,* even if defendants are correct and individual reliance must be shown for each class member, "there is an abundance of authority for the proposition that reliance is an issue which can be treated in subsequent proceedings, and a class action should not be precluded where individual reliance must be shown." *Seiden v. Nicholson,* 69 F.R.D. 681, 686 (N.D.Ill.1976) and cases and authorities cited therein. *See Arthur Young & Co. v. United States District Court, supra,* 549 F.2d 690, 693 n. 10, 694–96; *Muth v. Dechert, Price and Rhoads, supra,* 70 F.R.D. 607, n. 10; *Sharp v. Coopers & Lybrand, supra,* 70 F.R.D. 547 and cases cited therein. The possibility that individual questions of reliance may have to be resolved does not preclude the predominance of common factual and legal questions in these four cases.

▉▉ The Attorney defendants also contend that each class member will have to prove separately how any alleged misrepresentations and omissions were "material" to him, that is, the circumstances surrounding each purchase by each member of the class must be examined to determine "materiality." This Court does not agree. In *Chris-Craft Industries, Inc. v. Piper Aircraft Corp.,* 480 F.2d 341 (2d Cir. 1973), the Court discussed "materiality" as follows:

"The concept of materiality focuses on the weightiness of the misstated or omitted fact in a reasonable investor's decision to buy or sell. We articulated the materiality standard in *List v. Fashion Park, Inc.,* 340 F.2d 457, 462 [2 Cir. 1965], *cert. denied,* 382 U.S. 811 [86 S.Ct. 23, 15 L.Ed.2d 60] (1965), to be 'whether "a reasonable man would attach importance [to the fact misrepresented] in determining his choice of action in the transaction in question." ' [Footnote omitted.]

"The materiality test is concerned only the whether a prototype reasonable investor would have relied. See *Heit v. Weitzen,* 402 F.2d 909, 912–14 [2d Cir. 1968], *cert. denied,* 395 U.S. 903 [89 S.Ct. 1740, 23 L.Ed.2d 217] (1969). Account must be taken of all the surrounding circumstances to determine whether the fact under consideration is of such significance that a reasonable investor would weigh it in his decision whether or not to invest." [Citation omitted.] *Id.* at 362–63.

The Supreme Court recently has reaffirmed that "materiality" is to be viewed by an objective rather than a subjective standard. *See TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976); *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), *rehearing denied,* 407 U.S. 916, 92 S.Ct. 2430, 32 L.Ed.2d 692 (1972); *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). Thus, the "surrounding circumstances" must be examined to determine whether there is a substantial likelihood that a reasonable investor, not the individual investor, would attach importance to the alleged misrepresentation or omission. *See Arthur Young & Co. v. United States District Court,* 549 F.2d 686, 694–95 (9th Cir. 1977); *Securities and Exchange Commission v. American Realty Trust,* 429 F.Supp. 1148, 1170 (E.D.Va.1977); *Berkowitz v. Baron,* 428 F.Supp. 1190, 1195 (S.D.N.Y.1977). On this motion for class certification, this Court cannot examine the merits of the complaint and decide whether the alleged misrepresentations and omissions were "material." *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). Therefore, for all the reasons previously discussed, this Court rejects an individualistic approach to proof of "reliance" issues because of an alleged "common course of fraudulent conduct," and "materiality" is found also to be a common factual question. If, at a subsequent point in the proceedings in this litigation, defendants are able to demonstrate that the alleged misrepresentations and omissions were not "material," or that justice requires that

each class member individually prove "materiality" as to him, then this Court, under the flexibility available to it by Rule 23(c)(1), will appropriately alter or amend the class certification order. The same approach can and will be utilized in the area of "reliance" should subsequent developments so require.

■ The Attorney defendants quite correctly argue that even if an inference of reliance may be raised as to issues proved to be material, that inference may be rebutted by evidence of non-reliance or non-materiality. *See Blackie v. Barrack,* 524 F.2d 891, 906 (9th Cir. 1975); *Rochez Bros., Inc. v. Rhoades,* 491 F.2d 402, 410 (3d Cir. 1974), *cert. denied* 425 U.S. 993, 96 S.Ct. 2205, 48 L.Ed.2d 817 (1976). These defendants contend that their right to rebut reliance and materiality will necessarily cause individual issues to predominate and that class treatment of the reliance and materiality issues is thus untenable. While at this stage of the proceedings it appears that defendants may be able to show some instances of non-materiality and/or non-reliance concerning certain plaintiffs, the court is convinced, subject of course to further developments, that the proof of non-reliance which defendants may submit at trial will not be so extensive, complex or time-consuming as to predominate over common factual and legal issues. *See Arthur Young & Co. v. United States District Court,* 549 F.2d 686, 695 (9th Cir. 1977); *Little v. First California Co.,* 532 F.2d 1302, 1305 (9th Cir. 1976); *Blackie v. Barrack,* 524 F.2d 891, 907 n. 22 (9th Cir. 1975); *Simon v. Westinghouse Electric Corp.,* 73 F.R.D. 480, 486–87 (E.D. Pa.1977); *Clark v. Cameron-Brown Co.,* 72 F.R.D. 48, 58 (M.D.N.C.1976); *Sharp v. Coopers & Lybrand,* 70 F.R.D. 544, 547 (E.D.Pa. 1976).

■ The Attorney and accountant defendants further contend that the individual calculations of damages that will be necessary if defendants are found liable, far outweigh any common questions presented. This contention is without merit. Although this Court agrees that individual questions of damages are raised, the Court considers it highly imprudent to deny class certification at this stage of the litigation merely because proof of damages may require determination on an individual basis. *See Simon v. Westinghouse Electric Corp.,* 73 F.R.D. 480, 486 (E.D.Pa.1977). Damages in this litigation do not appear to pose the same type of problem that is presented by the issues of "reliance," "materiality," and "statute of limitations," but rather may be a matter of administering a formula derived from the resolution of defendants' liability, if any.

■ In sum, the arguments that the opponents advance in opposition to plaintiffs' motion for class action certification do not raise novel issues because the same contentions have been made since the promulgation of the revised F.R.Civ.P. 23 in 1966. To acknowledge the defendants' position would be to emasculate the vitality of the amended class-action rule in security fraud cases. *Umbriac v. American Snacks, Inc.,* 388 F.Supp. 265 (E.D.Pa.1975); *Siegel v. Chicken Delight, Inc.,* 271 F.Supp. 722 (N.D. Cal.1967). That common questions must predominate is not equivalent to the proposition that they must be dispositive of the entire litigation. Indeed, individual questions of law or fact peculiar to certain potential class members may remain after the common issues are resolved. *Dolgow v. Anderson,* 43 F.R.D. 472 (E.D.N.Y.1968).

Finally, several defendants contend that because of court decisions restricting the right of recovery in private securities actions under Section 10(b) to buyers or sellers of securities, *see Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975); *Birnbaum v. Newport Steel Corp.,* 193 F.2d 461 (2d Cir.), *cert. denied,* 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952), various Home-Stake investors have failed to state a cause of action against them and therefore may not be represented in a class action. These defendants include: 1) Arthur Andersen & Co., an accounting firm and the sole defendant in *Luce,* which apparently was directly involved in only the 1967 Home-Stake Program; 2) McKee, Atkins and Schuler, an

accounting firm which apparently was directly involved in only the 1968 Program and is the sole defendant in *Robertson;* 3) the law firm of McAfee, Taft, Mark, Bond, Rucks & Woodruff, an *Anixter* defendant that participated in the 1970 and 1971 Programs and which may have been involved in some of the earlier programs; and 4) Kothe and Eagleton, a law firm which participated in the 1971 Program. Each of these defendants has been sued not only by purchasers from the particular Program or Programs with which the defendant was directly associated, but also by Home-Stake investors during earlier years. These four defendants thus contend that the *Luce, Robertson* and *Anixter* named plaintiffs seek to represent two fundamentally disparate classes: (1) investors who were allegedly induced by these defendants to *purchase* units in a particular Program, and (2) investors who were allegedly induced by these defendants to *retain* units in earlier programs purchased by them in earlier years. This second class of investors is barred from recovering any damages for retention of their units by the *Birnbaum-Blue Chip* rule, these defendants maintain.

The Court has already expressly denied motions to dismiss based upon similar, if not identical, grounds. See Pre-Trial Order No. 7, ¶ 3, *In re Home-Stake Production Company Securities Litigation,* MDL–153 (N.D.Okla. filed July 20, 1976); Transcript of Pre-Trial Hearing, June 24, 1976, p. 96. Nevertheless, defendants have continued to argue the applicability of *Birnbaum* and *Blue Chip,* and, pursuant to the court's orders of May 5 and May 6, 1977, all interested parties have recently filed up-dated briefs on this issue. The court has carefully examined and fully reviewed all the memoranda and exhibits incorporated therein submitted to the court by plaintiffs and defendants on this issue, and the court has fully considered all relevant oral arguments presented on April 8, 1976, June 24, 1976, and May 5, 1977. The court is fully satisfied at this time that the contentions of defendants Andersen, McKee, McAfee, Taft and Kothe and Eagleton are without merit.

The court agrees with defendants that the *Birnbaum-Blue Chip* line of decisions has firmly established that there is no federal right of action for fraud allegedly committed for the purpose of *inducing* the retention of a security, as distinguished from its purchase or sale. Defendants' arguments here, however, mischaracterize the claims of plaintiffs in *Anixter, Luce* and *Robertson.* Plaintiffs in these actions have alleged a continuing conspiracy or course of conduct designed to defraud Home-Stake investors, aided and abetted, or participated in, by, *inter alia,* Andersen, McKee, McAfee, Taft and Eagleton. Therefore, plaintiffs assert, they are not claiming that some purchasers were induced by these defendants actions to *retain* their units; what is alleged is that the same overall conspiracy that injured earlier purchasers at the time of their investment was joined in and knowingly assisted by Andersen, McKee, McAfee Taft and Kothe and Eagleton during the various periods that these defendants were directly involved with Home-Stake. *See Simon v. Westinghouse Electric Corporation,* 73 F.R.D. 480, 488 (E.D.Pa.1977). Numerous decisions have found and held that knowing assistance of or participation in a conspiracy or fraudulent scheme under the securities laws gives rise to liability equal to that of the primary actors. *See, e.g., Zabriskie v. Lewis,* 507 F.2d 546, 553–54 (10th Cir. 1974); *Kerbs v. Fall River Indus., Inc.,* 502 F.2d 731, 739–40 (10th Cir. 1974); *Ferguson v. Omnimedia, Inc.,* 469 F.2d 194, 197–98 (1st Cir. 1972); *Herpich v. Wilder,* 430 F.2d 818, 819 (5th Cir. 1970), *cert. denied,* 401 U.S. 947, 91 S.Ct. 935, 28 L.Ed.2d 230 (1971); *Brennan v. Midwestern United Life Insurance Company,* 417 F.2d 147 (7th Cir. 1969), *cert. denied,* 397 U.S. 989, 90 S.Ct. 1122, 25 L.Ed.2d 397 (1970); *Myzel v. Fields,* 386 F.2d 718, 738 n. 12 (8th Cir. 1967), *cert. denied,* 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968); *Dasho v. Susquehanna Corp.,* 380 F.2d 262, 267 n. 2 (7th Cir. 1967); *Fischer v. New York Stock Exchange,* 408 F.Supp. 745, 751 (S.D.N.Y.1976); *Epprecht v. Delaware Val. Machinery, Inc.,* 407 F.Supp. 315, 320–323 (E.D.Pa.1976); *Pettit*

*v. American Stock Exchange,* 217 F.Supp. 21, 28 (S.D.N.Y.1963). The law is also clear that Andersen, McKee, McAfee, Taft and Kothe and Eagleton may be jointly and severally liable for all damages accruing prior to the time that these defendants allegedly assisted or participated in the conspiracy or fraudulent course of conduct. In *Walder v. Paramount Publix Corporation,* 132 F.Supp. 912, 920 (S.D.N.Y.1955), an antitrust action, Judge Weinfeld stated:

> One final matter remains. The defendants Paramount Pictures Corporation and American Broadcasting-Paramount urge that the complaint must be dismissed as to them since they were not formed until 1949, and cannot be held for acts committed before they came into existence. This contention overlooks the fact that these defendants are charged with having joined a conspiracy continuing from 1928 to the filing of the complaint. Under well established principles of conspiracy law, they may be held as fully liable as the original or earlier participants in the conspiracy.

Also see: *In Re Nissan Motor Corp. Antitrust Litigation,* 430 F.Supp. 231 (S.D.N.Y. 1977). Similarly, in *Ratner v. Scientific Resources Corporation,* 53 F.R.D. 325, 329 (S.D.Fla.1971), appeal dismissed 402 F.2d 616 (5th Cir. 1972), a securities action, the court commented:

> Defendant Land Resources Corporation was not yet in existence at the time the agreement between the parties was executed, and claims, therefore, that it could not have made misrepresentations to plaintiffs. But 15 U.S.C. § 78j includes co-conspirators and one who knowingly joins a conspiracy takes it as he finds it, *Myzel v. Fields [supra].*

2. "Superiority of A Class Action To Other Available Means For The Fair and Efficient Adjudication of the Controversy"

■ The other requirement of Rule 23(b)(3)—that the class action device be superior to other available methods for the fair and efficient adjudication of the controversy—includes the problem of "manageability," which encompasses the entire range of practical problems that may render any class action inappropriate. An abundance of authorities sustain the superiority of class actions in situations such as this, *see Wolfson v. Solomon,* 54 F.R.D. 584 (S.D.N.Y.1972) especially when investors may not otherwise seek recovery. *Korn v. Franchard Corp.,* 50 F.R.D. 57 (S.D.N.Y. 1970), *rev'd and remanded,* 456 F.2d 1206 (2d Cir. 1972). Moreover, this litigation requires class action designation because of the non-feasibility of joining all Home-Stake securities holders pursuant to Rules 19 and 20 of the Federal Rules of Civil Procedure. While large, this litigation does not approach the size of classes that have been held to be manageable and, thus certified in other securities actions. *See, e.g., Grad v. Memorex Corp.,* 61 F.R.D. 88 (N.D. Cal.1973) (60,000 member class). Furthermore, and of perhaps more importance, each class member is readily identifiable.

■ It should be recognized that difficulties in the management of these class actions do not preclude a finding that they are superior to other available means for the fair and efficient adjudication of the controversy. Manageability problems are significant only if they create a situation that is less fair and efficient than other available techniques. This perspective is important in this litigation since the opponents, after reciting potential manageability problems, offer no viable alternative.

■ *Anixter* plaintiffs also seek class certification based upon F.R.Civ.P. 23(b)(1). A detailed research into this area reveals that plaintiffs' proposal is contrary to voluminous case law holding that class actions cannot be maintained under Rule 23(b)(1) for securities fraud claims. *Crasto v. Estate of Kaskel,* 63 F.R.D. 18 (S.D.N.Y.1974); *Berley v. Dreyfus & Co.,* 43 F.R.D. 397 (S.D.N.Y.1967); *Zeigler v. Gibraltar Life Insurance Co. of America,* 43 F.R.D. 169 (D.S.D.1967); *Berger v. Purolator Products, Inc.,* 41 F.R.D. 542 (S.D.N.Y.1966). Not even the *Anixter* plaintiffs contend that all Home-Stake investors *must* join and be

bound as members of their class, yet that is the premise underlying Rule 23(b)(1) because under this Rule, no class member can "opt-out." See *F.R.Civ.P.* 23(c)(2). When, as here, investors' claims vary with their unique personal factual situations, Rule 23(b)(1)(B) certification is wholly inappropriate. The proper view is that expressed in *Tober v. Charnita,* 58 F.R.D. 74 (M.D.Pa. 1973), a purported class action alleging violations of Section 17(a) of the Securities Act of 1933, Section 10(b) of the Securities Exchange Act of 1934 and common law fraud. There the Court refused to certify a class under Rule 23(b)(1)(A), stating:

> "Certification under 23(b)(1) should properly be confined to those causes of action in which there is a *total absence of individual issues.* Only subdivision 23(b)(3) should be applicable to a cause of action, such as the instant one, involving the aggregation of individual claims arising out of one alleged wrong or common course of conduct." *Id.* at 81 (Emphasis added.)

See also *Al Barnett & Son, Inc. v. Outboard Marine Corp.,* 64 F.R.D. 43 (D.Del.1974).

## IV. *CLASS DESIGNATION*

Concluding that the requirements mandated by Rule 23 have been satisfied, the Court hereby certifies the following nine classes for this litigation. Each class is subdivided to reflect the view of the Court that claims under Sections 11 and 12 of the Securities Act of 1933 require separate treatment from the other asserted violations.[16] See: *In Re U.S. Financial Securities Litigation,* 64 F.R.D. 443, 454–55 (S.D. Cal.1974); *Wolfson v. Solomon,* 54 F.R.D. 584, 588–89 (S.D.N.Y.1972).

The reason for the creation of nine classes is that the factual situation underlying this litigation demonstrates that Home-Stake, acting through and with the assistance of groups of individual defendants whose composition changed periodically, formed nine separate and distinct POCs, purportedly to operate nine disparate oil and gas recovery programs, which were to be financed through nine separate registered offerings of securities. Consequently, nine groups of participants were intentionally established, with a certain type of common membership among them—either a co-tenancy or a joint venture. The sale of each year's units was a unique activity, allegedly involving particularized fraudulent conduct by a certain group of defendants that was aimed at a specific group of investors under different factual circumstances. While each program offered prospective and actual investors a variety of oral and written representations, such rep-

---

**16.** Section 11 provides that only those persons or entities have standing to sue who purchased their securities pursuant to a registration statement. *See, e.g., Barnes v. Osofsky,* 373 F.2d 269 (2d Cir. 1967); *Colonial Realty Corp. v. Brunswick Corp.,* 257 F.Supp. 875 (S.D.N.Y. 1966). This section provides, in relevant part:

"(a) In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, *any person acquiring such security* (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may . . . sue." (Emphasis added.)

Furthermore, Section 12 provides a cause of action for a purchaser or securities only against the person or entity who sold the securities to him and, therefore, requires the establishment of "privity." This section provides, in relevant part:

"Any person who—

(2) offers or *sells* a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable to the person purchasing such security from him . . . ." (Emphasis added.)

As used in Section 12(2), a prospectus means more than the prospectus commonly thought of in connection with registration statements. It includes any written communication, and even an oral one communicated by radio or television, which offers any security for sale. *See* Section 2(10) of the Securities Act of 1933 (15 U.S.C. § 77b(10)).

resentations were generally similar to achieve the objectives of a particular program offered. The persons associated with each program—Home-Stake executives, salesmen, attorneys, accountants and geologists who prepared the sales material—compose a disparate defendant group for each program, although some individuals may have been employed or utilized in more than one program. Therefore, certain "conspiracy" allegations are unique to certain programs, which, in turn, create defenses common only to that program. Thus, while fundamental issues of securities laws and certain basic facts are common to all Home-Stake investors within the framework of the entire litigation, many of the issues and facts vary from program to program.[17]

■ *Class One*—consisting of all persons or entities, or their successors in interest, who claim to have been damaged as a result of the activities of defendants by purchasing from Home-Stake or its POCs participating interests in oil and gas drilling programs of Home-Stake 1964 Program Operating Corporation, and who were holders of such interests as of September 20, 1973;[18]

> *Subclass One*—consisting of all members of Class One who are asserting any claims against defendants pursuant to Section 10 of the Securities Exchange Act of 1934 and/or Section 17 of the Securities Act of 1933;
>
> *Subclass Two*—consisting of all members of Class One who are asserting any claims against defendants pursuant to Sections 11 and 12 of the Securities Act of 1933;

*Class Two*—consisting of all persons or entities, or their successors in interest, who claim to have been damaged as a result of the activities of defendants by purchasing from Home-Stake or its POCs participating interests in oil and gas drilling programs of the Home-Stake 1965 Program Operating Corporation, and who were holders of such interests as of September 20, 1973;

> *Subclass One*—consisting of all members of Class Two who are asserting any claims against defendants pursuant to Section 10 of the Securities Exchange Act of 1934, and or Section 17 of the Securities Act of 1933;
>
> *Subclass Two*—consisting of all members of Class Two who are asserting any claims against defendants pursuant to Sections 11 and 12 of the Securities Act of 1933;

*Class Three*—consisting of all persons or entities, or their successors in interest, who claim to have been damaged as a result of the activities of defendants by purchasing from Home-Stake or its POCs' participating interests in oil and gas drilling programs of the Home-Stake 1966 Program Operating Corporation, and who were holders of such interests as of September 20, 1973;

> *Subclass One*—consisting of all members of Class Three who are asserting any claims against defendants pursuant to Section 10 of the Securities Exchange Act of 1934 and/or Section 17 of the Securities Act of 1933;
>
> *Subclass Two*—consisting of all members of Class Three who are asserting any

---

**17.** The Attorney defendants argue that this or any other Court may not, *sua sponte,* grant class action status. More importantly, these opponents suggest that it would be unwise for this Court to modify the *Anixter* plaintiffs' existing motion for the certification of a class action since no party has sought such a modification. Nonetheless, this Court is satisfied that it is empowered to modify the *Anixter* plaintiffs' original motion for the determination of a class action. *See, e.g., In re Caesars Palace Securities Litigation,* 360 F.Supp. 366 (S.D.N.Y. 1973); *Tober v. Charnita, Inc.,* 58 F.R.D. 74 (M.D.Pa.1973); *Frankel v. Wyllie and Thornhill, Inc.,* 55 F.R.D. 330 (W.D.Va.1972); *Benzoni v. Greve,* 54 F.R.D. 450 (S.D.N.Y.1972); *Sie-*

*gel v. Realty Equities Corp.,* 54 F.R.D. 420 (S.D. N.Y.1972); *Manual for Complex Litigation,* "Necessity for Early Determination of Class Action Questions," Part I, § 1.40 p. 17 (rev. ed. 1973).

**18.** By so structuring these classes and subclasses, "charitable donees" are excluded from class participation for two reasons: (1) the claims of charitable donees, whose claims essentially are derivative in nature, may well conflict with those of their charitable donors; and (2) no charitable donee representative presently exists among the ALR plaintiffs to represent this group.

claims against defendants pursuant to Sections 11 and 12 of the Securities Act of 1933;

*Class Four*—consisting of all persons or entities, or their successors in interest, who claim to have been damaged as a result of the activities of defendants by purchasing from Home-Stake or its POCs participating interests in oil and gas drilling programs of the Home-Stake 1967 Program Operating Corporation, and who were holders of such interests as of September 20, 1973;

*Subclass One*—consisting of all members of Class Four who are asserting any claims against defendants pursuant to Section 10 of the Securities Exchange Act of 1934 and/or Section 17 of the Securities Act of 1933;

*Subclass Two*—consisting of all members of Class ·Four who are asserting any claims against defendants pursuant to Sections 11 and 12 of the Securities Act of 1933;

*Class Five*—consisting of all persons or entities, or their successors in interest, who claim to have been damaged as a result of the activities of defendants by purchasing from Home-Stake or its POCs participating interests in oil and gas drilling programs of the Home-Stake 1968 Program Operating Corporation, and who were holders of such interests as of September 20, 1973;

*Subclass One*—consisting of all members of Class Five who are asserting any claims against defendants pursuant to Section 10 of the Securities Exchange Act of 1934 and/or Section 17 of the Securities Act of 1933;

*Subclass Two*—consisting of all members of Class Five who are asserting any claims against defendants pursuant to Sections 11 and 12 of the Securities Act of 1933;

*Class Six*—consisting of all persons or entities, or their successors in interest, who claim to have been damaged as a result of the activities of defendants by purchasing

from Home-Stake or its POCs participating interests in oil and gas drilling programs of the Home-Stake 1969 Program Operating Corporation, and who were holders of such interests as of September 20, 1973;

*Subclass One*—consisting of all members of Class Six who are asserting any claims against defendants pursuant to Section 10 of the Securities Exchange Act of 1934 and/or Section 17 of the Securities Act of 1933;

*Subclass Two*—consisting of all members of Class Six who are asserting any claims against defendants pursuant to Sections 11 and 12 of the Securities Act of 1933;

*Class Seven*—consisting of all persons or entities, or their successors in interest, who claim to have been damaged as a result of the activities of defendants by purchasing from Home-Stake or its POCs participating interests in oil and gas drilling programs of the Home-Stake 1970 Program Operating Corporation, and who were holders of such interests as of September 20, 1973;

*Subclass One*—consisting of all members of Class Seven who are asserting any claims against defendants pursuant to Section 10 of the Securities Exchange Act of 1934 and/or Section 17 of the Securities Act of 1933;

*Subclass Two*—consisting of all members of Class Seven who are asserting any claims against defendants pursuant to Sections 11 and 12 of the Securities Act of 1933;

*Subclass Three*[19]—consisting of all members of Class Seven who did not accept the rescission offer of the Home-Stake 1970 Program Operating Corporation contained in the registration statement and prospectus dated April 22, 1971, which registration statement appears to have become effective on April 23, 1971;

*Class Eight*—consisting of all persons or entities, or their successors in interest, who claim to have been damaged as a result of the activities of defendants by purchasing

---

**19.** This Court is establishing Subclass Three for all those persons or entities represented by William Grohne and James Leachman in the *Anixter II* complaint filed on April 22, 1974, which is designated as *Ivan A. Anixter, et al. v. Harry Heller, et al.*, N.D.Okla., Civil Action No. C–74–244.

from Home-Stake or its POCs participating interests in oil and gas drilling programs of the Home-Stake in 1971 Program Operating Corporation, and who were holders of such interests as of September 20, 1973;

*Subclass One*—consisting of all members of Class Eight who are asserting any claims against defendants pursuant to Section 10 of the Securities Exchange Act of 1934 and/or Section 17 of the Securities Act of 1933;

*Subclass Two*—consisting of all members of Class Eight who are asserting any claims against defendants pursuant to Sections 11 and 12 of the Securities Act of 1933;

*Class Nine*—consisting of all persons or entities, or their successor in interests, who claim to have been damaged as a result of the activities of defendants by purchasing from Home-Stake or its POCs participating interests in oil and gas drilling programs of the Home-Stake 1972 Program Operating Corporation, and who were holders of such interests as of September 20, 1973;

*Subclass One*—consisting of all members of Class Nine who are asserting any claims against defendants pursuant to Section 10 of the Securities Exchange Act of 1934 and/or Section 17 of the Securities Act of 1933;

*Subclass Two*—consisting of all members of Class Nine who are asserting any claims against defendants pursuant to Sections 11 and 12 of the Securities Act of 1933.

Specifically excluded from all the aforementioned classes and subclasses are all the defendants named, the officers and directors of Home-Stake or any of its subsidiaries, and all persons who have received sales commissions, salaries, gifts or other consideration in any form, from Home-Stake or any of its subsidiaries, because of their efforts in connection with the sale by any Home-Stake Company of participating interests to investors and against whom the members of the class or subclasses may have a right to assert a claim for damages.

Also, class treatment has not been accorded plaintiffs' claims of common law fraud in *Anixter I.* Counsel for *Anixter* plaintiffs informed the Court that class treatment was not sought with respect to those claims nor is the Court convinced such claims are proper subjects for class action treatment.

The representatives for these plaintiff classes and subclasses shall be as follows:

| Class No. | Class Description | Representative Plaintiff(s) | Amount of Investment | Cases in Which Claims Asserted |
|---|---|---|---|---|
| I | 1964 Program Unit-holders | William H. Dennler | $ 18,800 | Anixter I Luce Robertson |
| II | 1965 Program Unit-holders | John D. Lockton Francis K. McCune (alternate) | 114,000 71,250 | Anixter I Luce Robertson |
| III | 1966 Program Unit-holders | Ted B. Westfall | 114,000 | Anixter I Luce Robertson |
| IV | 1967 Program Unit-holders | William H. Mortensen Peter P. Luce (alternate) | 57,000 38,000 | Anixter I Luce Robertson |
| V | 1968 Program Unit-holders | William D. Robertson Bernard D. Broeker (alternate) | 9,500 19,000 | Anixter I Luce |

| Class No. | Class Description | Representative Plaintiff(s) | Amount of Investment | Cases in Which Claims Asserted |
|---|---|---|---|---|
| VI | 1969 Program Unit-holders | Thomas H. Thorner Dolly Yoshida Martin (alternate) | $ 12,000 5,000 | Anixter I Robertson |
| VII | 1970 Program Unit-holders | William Grohne James H. Leachman (alternate) | 10,000 500,000 | Anixter I Anixter II |
| VIII | 1971 Program Unit-holders | Beverly H. Warren Ivan A. Anixter | 60,000 10,000 | Anixter I |
| IX | 1972 Program Unit-holder | Joseph C. Bennett | 20,000 | Anixter I |

## CONCLUSION

The foregoing class, subclass and representative designations are provisional to the extent that any or all may be broadened, delimited or subdivided as discovery or other developments in these actions may indicate appropriate. F.R.Civ.P. 23(c)(4).

## NOTICE

■ It is well established that notice must be distributed to all class members at the earliest possible time. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732, 1974; R. 23(c)(2), F.R.Civ.P.

On several previous occasions, the representative plaintiffs have submitted to the court drafts of proposed notice to be distributed to class members. The court is fully satisfied that notice can and must promptly be distributed to members of the classes certified herein. Accordingly, counsel for plaintiffs shall serve on defendants and the court and file with the clerk a proposed draft of notice for comment by opposing counsel and for approval of the court, not later than August 8, 1977. The proposed draft shall include: (1) the proposed form of individual notice to be given to every identifiable class member; (2) a proposed form of notice to be given to unknown and not easily identifiable class members by publication (if deemed appropriate); (3) a proposed exclusion request (if deemed appropriate); and (4) a proposed proof of claim form (if deemed appropriate). Counsel for plaintiffs, at the same time, shall serve and file a memorandum discussing the subjects listed below:

1. The issue of who should bear the cost of preparing and distributing the proposed notice.

2. Whether the use of a proof of claim form is necessary, proper or desirable in this litigation.

3. Whether notice by publication is necessary, proper or advisable in this litigation.

Defendants shall serve and file memoranda setting forth in detail objections, if any, they may have to the proposed notice, as well as any responsive memoranda concerning the three issues listed above, on or before August 18, 1977. Plaintiffs may reply on or before August 22, 1977.

The memoranda shall be thorough but as brief as the subject matter permits. Counsel may incorporate by reference relevant portions of prior briefs or memoranda, etc. filed herein, provided a copy of any reference material shall be attached to the memoranda.

Upon the filing of all memoranda this matter shall be deemed submitted and the court will, at its earliest opportunity, render decision upon all matters pertaining to class notice.

IT IS SO ORDERED this 27th day of July, 1977.